### WALL PUMP & COMPRESSOR CO. v. GARDNER GOVERNOR CO.

### GARDNER GOVERNOR CO. v. WALL PUMP & COMPRESSOR CO.

Circuit Court of Appeals, Seventh Circuit. September 13, 1928.

Nos. 3811, 3816.

Fig. 2 of the patent is:

Henry E. Rockwell, of New Haven, Conn., for plaintiff.

Edmund Quincy Moses, of New York City, for defendant.

Before ALSCHULER and ANDERSON, Circuit Judges, and CARPENTER, District Judge.

ALSCHULER, Circuit Judge. The appeals involve 9 of the 53 claims of United States patent No. 1,450,032, to Gardner, March 27, 1923, application filed September 23, 1919, for improvements in two-stage air compressor mechanism used mainly in garages, filling stations, etc., to supply air for automobile tires. Wall Pump & Compressor Company (herein called defendant) appeals from so much of the decree of the District Court as holds valid and infringed claims 42, 47, 49, and 51; and Gardner Governor Company (herein called plaintiff), assignee of the patent, appeals from so much of the decree as holds void claims 4, 14, 16, 20, and 24.

In view of the defense, claim 51 is typical. It is:

"51. In a compressor mechanism, in combination, coaxially disposed high and low pressure cylinders having flanged air cooling jackets, a parallel intercooler thereabove and having a similar flanged jacket, an aftercooler parallel to and connected beneath said high pressure cylinder and having a similar flanged jacket, pistons in said cylinders, a flywheel operatively connected to said pistons and having fan blades directing a flow of cooling fluid over the flanged jacket of each of said elements, a motor driving said flywheel, a pressure controlled motor controlling switch, and means operated upon actuation of said switch to relieve the pressure in said aftercooler and purge the latter of liquid."

All the claims of the patent are for a combination; none for a specific structure of any element.

It shows a side elevation in partially vertical section, having a low pressure cylinder *1* into which the air is first drawn and compressed and forced into pipe *28*, through "intercooler" *29*, thence downward through pipe *31*, whence it passes into high pressure cylinder *2*, where it is further compressed and forced through pipe *35*, into the "aftercooler" *36*, and through pipe *39* into the receiving tank. At the bottom of the aftercooler there is a depression or sump for receiving the precipitated moisture and oil, and there is mechanism for automatically discharging the condensates, and for automatically starting and stopping the compressor when the air pressure in the tank reaches a predetermined stage.

A motor, with belt, drives flywheel *6*, which is mounted on the crank shaft. To the inner side of the flywheel rim are attached fan blades, so set that the revolving flywheel drives air against the compressor, particularly the cylinders, intercooler, and aftercooler, which are provided with radiating fins or corrugations to further facilitate cooling of the parts, and the compressed air stream which the compression causes to become heated.

The defense is invalidity, for want of invention, and aggregation; also prior publication and prior use.

About 1900 plaintiff, then an old concern manufacturing engine specialties, began making air compressors. Other concerns were making them, and the demand for them increased rapidly with the use of automobiles and the multiplication of public garages; the more recent installation of filling stations at most every crossroads in the land gave great impetus to their manufacture, and various large concerns, in-

cluding plaintiff, produced them in large numbers.

In the keen competition for the business, quite naturally each maker strove to produce something distinctive, featuring any real or colorable advance, and emphasizing "talking points" calculated to impress the buying public. Such, in general, was the state of the industry when, at some more or less indefinite time prior to application date, the patentee, plaintiff's president, began to work upon a new model of compressor.

In such a wilderness of claims, and so voluminous a record, one strives to discover whether there is not disclosed some central idea of what the inventor considered to be his new and useful contribution. The evidence of the patentee contains an indication of what he thought about it, as this extract from his cross-examination tends to show:

"Q. Can you name any others that you considered notifying at that time? A. Every one who was manufacturing the two-stage compressor with fan flywheel.

"Q. That's really what your invention gets down to in a broad aspect, two-stage compressor with a fan flywheel? A. Yes, sir."

Without limiting the invention to what was thus perhaps casually stated, it may be fairly concluded that, shortly prior to his filing date, the patentee had settled on this as his outstanding advance. He neither asserts nor claims invention of the two-stage compressor, which is simply one with low and high pressure cylinders. In the state of the art the number of compressions would ordinarily be a matter of choice.

In patent No. 918,194, 1909, to Pocock and Allgire, for an air compressor, a plurality of cylinders with progressively higher compression is described, as many as four being shown. Two-stage compressors were in use long prior to Gardner.

Flywheels equipped with fan blades for creating a current of air while revolving were very old. Patent No. 710,727, to Wilson, 1902, points out how, for further cooling, the spokes of the flywheel may be arranged like a fan or a screw. No 911,540, to Guilford, 1909, is for a particular form of radial spokes combined with a flywheel "so arranged as to perform the additional function of cooling fans." No. 1,177,824, to Silberzahn, 1916 (application filed 1912), is for a flywheel having short air-circulating vanes arranged on the inner side of the rim for creating air currents. Indeed, this patent shows short fan vanes between the spokes in quite the same way as Gardner's specification describes, a feature which, though urged in plaintiff's brief, is not secured by the claims in issue.

If the claimed new concept lay in having a fan flywheel combined with a two-stage compressor, we would have no hesitancy in concluding that no degree of invention would be involved in bringing them together. The fan flywheel does nothing different from what it did in its same relation in other structures, and the compressor is the same compressor it was before. But, as will be shown, even this combination of fan flywheel with a compressor was also old.

Nor is the situation changed when we consider the element in the combination of *finned* cylinders, intercooler, and aftercooler for affording increased radiation to these parts. The use of such fins to facilitate the cooling of heating parts is far from new with Gardner. In the Wilson patent (1902, above referred to) radiating fins on the cylinders are shown, and it is stated that the fan flywheel directs a current of air "onto the cylinders, which are, as usual, provided with radiating fins." The Silberzahn patent shows the "radiating ribs" of the combustion chamber arranged to receive the air currents from the fan flywheel. Two fan flywheels are shown, and it is stated: "With the vaned flywheels opposed to each other, * * * any cylinder or cylinders in the range therebetween have air currents continually all about them, insuring effective cooling throughout."

Apart from patents, there are publications in evidence showing at comparatively early date various structures of this general nature, with finned parts for increasing radiation, some with and some without the aid of an air current from a flanged flywheel. A trade directory of 1908 shows the De Tamble gas engine, with ribbed cylinders and fan flywheel. The Automobile Trade Journal, 1912, shows Curtis air pumps, some air-cooled and some water-cooled; and one illustration shows a single cylinder with radiation fins and "fan-shaped arms to flywheel which direct a current of air onto the radiation rings." The Manley air compressor, with fins on cylinders, is shown in a publication of March 15, 1916, and it is stated: "The two larger sizes have fan type flywheels to assist the air cooling." Indeed, Gardner testified that prior to his invention a number of man-

ufacturers made air-cooled compressors in smaller sizes, both vertical and horizontal, with varying types of radiating fins on cylinder to cool the air.

Surely the ribs or vanes upon the parts, as brought into this combination, do not function differently from the way they did in their prior use, doubtless for generations, and their employment, for such purpose only, cannot be said to have involved invention.

In emphasizing the efficacy of the flywheel of the patent, plaintiff's brief points out that the air current is blown upon pipe *35*, through which the compressed air passes from the high pressure cylinder to the aftercooler, thus assisting in the cooling. But this is just a plain pipe, and, if some designer should deem it advisable to equip it with fins to further facilitate radiation, surely this would not involve invention.

Being of the opinion that the equipping of the parts with radiating fins did not involve invention, was it invention to bring into the combination an intercooler or aftercooler, or either of them?

From reading the patent alone one might conclude that the terms "intercooler" and "aftercooler" were born with this invention. The very terms are old in the art. They were employed as far back as 1905 in the air compressor patent of Pocock and Allgire. From use of them, as well as from the terms themselves, we gather that the first refers to the conduit through which the air compressed in the first cylinder is carried to another for further compression, and the latter to the conduit through which it passes from the last cylinder into the place of ultimate confinement or use, since these, of whatever shape, would naturally tend to become cooled by the atmosphere.

Gardner testified that the leading manufacturer of air compressors prior to his invention was the United States Air Compressor Company, whose catalogue he saw in 1916 or earlier, disclosing a two-stage air-cooled cylinder with intercooler, but that upon test he found the air circulation was not sufficient for proper cooling; that about that time he also saw the Curtis catalogue, and tested its one-stage compressor, with fan flywheel, but which he deemed too small to cool sufficiently the finned cylinder.

The United States catalogue, which Gardner had prior to making his alleged invention, is replete with illustrations of two-stage compressors with fins on cylinders

and intercooler, and in general form like Gardner's, but without the fan flywheel. Gardner says he purchased one of these United States compressors prior to making his invention, and he offered in evidence the bill therefor to plaintiff dated November 6, 1916. The type billed is United States two-stage type H 41, a cut of which is:

Concededly Gardner adopted quite closely the general form of this compressor.

But, says plaintiff, the United States compressor does not have the intercooler, because an intercooler without an air draft upon it is not an intercooler at all. This, of course, is fallacious; the acceleration of cooling by means of fins alone being an expedient too old and well-known to require discussion. Indeed, they are shown in some structures of plaintiff's more recent catalogue without fan means, and would be entirely superfluous if not in and of themselves a cooling factor. While the United States machines of that catalogue do not have the fan flywheel, if greater air circulation were desired, it would not have involved invention to have taken Curtis' fan flywheel, which appears to have been used as far back as 1909, or any other of the various forms of fan flywheels long extant.

But, again says plaintiff, the United States machine does not have the aftercooler. It does have a chamber in its base into which the air passes from the high pressure cylinder through the diagonal pipe *F*, quite like pipe *35* of the patent machine, and from this chamber, as appears in the illustration, it passes through another pipe into the receiving tank. It is plain that every receptacle or pipe which intervenes between the high pressure cylinder and the tank is in degree an aftercooler, tending to

equalize the heat of any such conduit or receptacle and its contents with that of the surrounding atmosphere.

Again, says plaintiff, it is not an after-cooler because it does not have the flanges of the patent. What we have said sufficiently indicates our view that invention is not involved in so equipping such a conduit or receptacle. The presence or absence of such well-known radiating expedients, or the number or depth of such fins, involves engineering or mechanical judgment and skill, but to no degree invention.

The claims specify yet another element of the combination. In 51 it is described as "a pressure controlled motor controlling switch, and means operated upon actuation of said switch to relieve the pressure in said aftercooler and purge the latter of liquid."

There is illustrated and described, but not claimed, a form of device, the purpose of which is automatically to start and stop the compressor, and between its movements to discharge from the aftercooler any precipitation therein of moisture and oil.

On the page of the United States catalogue opposite that showing its type H machine it is stated: "The base of every one of our machines contains an oil separator, an automatic pressure release, a balanced outlet valve, and a safety valve. The oil separator prevents any oil from getting through to the air tank or tire. The automatic pressure release eliminates all danger," etc.

The advertisements of about that time of several other makes of compressors indicate the presence of means for removing precipitated oil and moisture, and the automatic starting and stopping of the compressor.

Patent No. 1,261,041, to Lipman, April 2, 1918 (application filed January 30, 1915), shows means for one object of the invention as stated in the specification: "To provide means in the pressure line between the compressor and the storage reservoir in which moisture, oil, etc., carried by the air from the compressor will be collected and from which it will be automatically discharged between successive operations of the compressor."

No particular mechanism for effecting this operation being claimed, it is important to know what then was open and what in fact was incorporated in the machine of the patent. It seems that, about two years before Gardner's application date, Wilboken, of Milwaukee, was on the market with an electrically controlled automatic device for starting and stopping air compressors, and when the compressor was at rest automatically opening a valve and blowing out the precipitated oil and moisture accumulating in the line of compression.

Wilboken's device was evidently well constructed and reliable, and at that time was quite generally purchased and used by the makers of air compressors, among them the plaintiff, by whom it was purchased and incorporated in the machine of his patent to supply this element. It is fair to assume from the evidence that, whatever Gardner's invention date may be, it was Wilboken's structure which he contemplated employing and did employ for this purpose.

Wilboken's device had no utility of itself, but only in connection with air compressors and similar mechanisms. With this device in quite general use, can it be said that invention was involved in buying it in the open market and using it in combination with the very sort of structure in which it was intended to be incorporated? It serves in this combination no different purpose from that for which Wilboken made and sold it as an article of commerce, and we do not see how Gardner's incorporation of it gave his machine an advantageous status in the art as a combination.

Thus far no mention has been made of the Globe and the Champion compressors, about which raged much of the controversy in the District Court. It appears from the Globe catalogue for 1913 that its compressor then had high and low pressure cylinders and intercooler, all finned, substantially in the same form and relation as in Gardner. It also has a finned aftercooler which is in vertical relation to these other elements, but not the fan flywheel, although the catalogue asserts that the Globe compressors have a greater area of radiating surface than any other type of air-cooled compressor, and that they never overheat. The fins are described as cooling flanges, and the intercooler as a "cooling chamber." The automatic starting and stopping is named as a feature, and mention is made of an "oil trap intermediate the cooling chambers." An automatic controller or switch is illustrated.

The Champion compressor was designed in January, 1919, and was manufactured and on the market in May of that year. It is, in general, quite similar to the Gardner, having similarly arranged flanged cylinders and intercooler with fan flywheel. It has the Wilboken controller, but its aftercooler

is of the box-base variety without the radiating fins. The various items of evidence, including the literature of the Champion Company, whose plant was at Chicago, make it clear that the Champion was in public use as early as May, 1919, about four months before Gardner's application date, and shortly after the production of his first two-stage compressor.

In distinguishing the machine of the patent from certain prior constructions or publications, Gardner's evidence points out, inter alia, that these do not have the radiating fins upon the aftercooler, having only the boxlike base. But after the granting of Gardner's patent the first competitor charged with its infringement was Champion, which was without the finned aftercooler, and had met with some success in the market. The charge resulted in a settlement whereby Champion recognized the validity of the patent and took a license under it. Plaintiff cites this circumstance as persuasively indicating validity of the patent. In certain circumstances this might be so, but, in our judgment, the contrary is here indicated.

By the agreement, made in November, 1923, Champion acknowledged validity of the patent, and in consideration of $50, paid by Champion to plaintiff, the latter gave Champion, during the patent term, a free license to manufacture and sell under the patent (except the use of radiating fins on the aftercooler), plaintiff agreeing to bring no action for past infringement.

If the patent was valid this agreement not only relieved Champion from liability for infringement, but gave Champion, at nominal cost, the benefit of the monopoly with plaintiff, without which agreement Champion had no monopoly and could get none; more than two years having passed since its device went upon the market. To the extent that the patent had value, it was very much to Champion's advantage to share in the monopoly; and its admission of validity, coupled with the free license, gave it a distinct advantage which it would not have had, even if it had successfully resisted the patent. To the extent that the contract was beneficial to Champion, it was disadvantageous to the plaintiff, which, without substantial compensation, shared its patent monopoly with an active competitor. Far from indicating a recognition of the patent by a competitor, it may indicate lack of faith in it on the part of the owner. This, of course, is not conclusive, but carries some evidentiary weight.

Upon the record it is extremely doubtful whether Gardner's invention date was carried back further than the times at which it was shown that the United States, the Globe, and the Champion concerns equipped some of their compressors with fan flywheel and substantially the other elements of Gardner's combination, assuming that a boxlike base, without the radiating fins, supplies the element of an aftercooler. Although parts of the inventor's testimony, taken at its face, might indicate that he antedated the others by a few weeks or months, it is significant that, long after the time of his alleged conception of the patent combination, and within a short time before his filing date, he made his first embodiment, which shows the flywheel without fan spokes, no aftercooler, and its intercooler at the base of the machine, instead of above the cylinders, as in the patent. The explanation that, although made in the Gardner shops, it was not made in accordance with his directions, is far from being impressive. If this embodiment represented his conception at that time, then surely these others very substantially antedated him for what they show.

It is of much significance here that about the same time several important builders of such machines—without relation to each other, and, so far as the evidence discloses, without knowledge of what Gardner or the others were doing—designed and built machines which substantially embody the elements of the patent, without themselves claiming to be inventors. Such a situation is instructively dealt with in section 25 of Walker on Patents, where it is stated:

"The absence of invention may be established in some cases, by evidence that a considerable number of persons who were not inventors, acting independently of each other, and without receiving any information from the patentee or his patent, did in fact contrive the improvement claimed therein, not long after he produced it."

Also in Concrete Appliances Co. et al. v. Gomery et al., 269 U. S. 177, at page 185, 46 S. Ct. 42, 45 (70 L. Ed. 222), the court said:

"The adaptation independently made by engineers and builders of these familiar appliances to the movement and distribution of wet concrete in building operations and the independent patent applications, within a comparatively short space of time, for devices for that purpose are in themselves persuasive evidence that this use in combination of well known mechanical elements was

the product only of ordinary mechanical or engineering skill and not of inventive genius. Atlantic Works v. Brady, 107 U. S. 192 [2 S. Ct. 225, 27 L. Ed. 438].''

We believe that the circumstances of the instant case invoke the application here of the principle thus stated, and give yet another reason for concluding, as we do, that the bringing together of the various elements of the claims manifests not invention, but only the exercise of such mechanical and engineering skill as might reasonably be expected in those versed in this department of endeavor.

What has been said necessarily applies to those claims which the District Court found invalid, as well as to those sustained. Upon plaintiff's appeal from the finding of invalidity of claims 4, 14, 16, 20, and 24, the decree is affirmed; upon defendant's appeal from the finding of validity of claims 42, 47, 49, and 51, the decree is reversed, with direction to dismiss the bill for want of equity. Each party shall pay half the costs of the appeals.