## DETROIT MOTOR APPLIANCE CO. v. TAYLOR et al.

### No. 4862.

Circuit Court of Appeals, Seventh Circuit.

Aug. 1, 1933.

320

Charles B. Belknap, of Toledo, Ohio, and Albert G. McCaleb, of Chicago, Ill., for appellant.

Frank E. Liverance, Jr., of Grand Rapids, Mich., and William M. Acton, of Danville, Ill., for appellees.

Before ALSCHULER, EVANS, and SPARKS, Circuit Judges.

ALSCHULER, Circuit Judge.

Appellant seeks reversal of a judgment dismissing, for want of equity, its bill charging appellees with infringement of United States patent to Crawford (assigned to appellant), No. 1,352,184, September 7, 1920, for improvement in radiator shields.

The invention has to do with means for regulating the flow of the air through automobile radiators for the purpose of cooling the water which circulates therein in order to keep the engine cool. As is well stated in appellees' brief: "The inventive concept of Crawford, therefore, was to take the old radiator consisting of core covered by a separate covering shell of sheet metal, admittedly old, extend the shell in front forward farther than it had been done previously, and mount in this forward extension of the shell in front of the radiator core, the shutter, which in closed position closed the front open panel of the shell and in open position exposed the air and water tubes of the radiator core to the air which might pass backwardly through the panel and the open shutters."

Claims 1, 4, and 8 are involved. Claim 4, appearing in the margin,[1] is sufficiently typical. All are combination claims whereof each of the elements is old in the art.

It is claimed that this invention brought

[1] "4. The combination with a radiator core, of a shell forming the regular outer finishing piece for said core formed of pressed sheet-metal having a front face with an open panel and side flanges extending rearward therefrom, the depth of said sides being sufficient to space the plane of the front from the front plane of the core, bearings mounted on the inner face of the sides of the front, shutters journaled in said bearings and extending across said open panel, and a common actuating means for said shutters, by which they may be simultaneously opened and closed in the space between the front faces of the shell and core."

together for the first time the extension beyond the face of the radiator proper of the shell or shield which surrounds it, and the shutters, mounted upon and within such extension, adapted to be opened or closed for regulating the extent of the opening for the air intake.

The court found that Crawford's claim 1 is without patentable novelty in view of prior United States patent to Wright, No. 1,152,585; and that his claims 4 and 8 are void of invention and without patentable novelty in view of said patent to Wright, patent to Furber, No. 1,114,246, and patent to Brock, No. 774,556.

Appellees' main reliance is upon the Wright patent, application for which was filed December 14, 1912. This device shows an extension of the radiator shield or shell beyond the radiator face, and at the front of the extension a series of fixed flat metal bars in the form of a grid, with open spaces between the bars, and with a corresponding sliding member for covering and uncovering the spaces. The contention is that before Crawford there were in this art shutters for regulating the air intake, and that it did not involve invention to substitute shutters for grids.

The Furber patent shows a structure not contained within the shield or shell itself, but adapted to be bolted to and carried on the core of the radiator. It showed shutters for regulating the intake, contained within this added structure.

The Brock patent, November 8, 1904, shows devices for cooling or heating the water in the radiators. It mentions pivoted slats as one means of opening and closing the walls of the casing; but it appears that the arrangement is not part of the shield or shell itself, if, indeed, such a shield is there shown; but it is bolted onto the radiator and not to an extension of the shield or shell, as in Furber.

Appellant contends that if in Wright shutters were substituted for grids, it would still fall short of showing the Crawford combination. If it be assumed that with such substitution Wright and Crawford would be substantially identical, it would be at least doubtful whether invention over Wright would be involved in the Crawford device; and were it not for the evidentiary influence of transactions between the parties, to which reference will hereinafter be made, we might be inclined to resolve the doubt in accordance with fact finding No. 10.

Fact finding No. 12 is to the effect that

the Crawford patent is void of patentable novelty in view of the patents to Carter, Kelzer, Tibbetts, and Fekete. As to this appellees' brief admits that if the twelfth finding of fact is on the basis that the four patents last named anticipate Crawford, and show invention earlier than the invention date to which Crawford is entitled, the finding is in conflict with the seventh finding, which fixes Crawford's invention date not later than December 16, 1915, which is prior to the filing date of each of these four patents.

Appellees admit they are bound by this seventh finding as to Crawford's invention date, and this obviates the need of discussing these patents as prior art or anticipation of Crawford.

Appellees contend that the pendency of so many applications at about this time tends to indicate that the Crawford improvement was the result of the normal growth of this art, and did not involve invention. This court's opinion in Wall Pump & Compressor Co. v. Gardner Governor Co., 28 F.(2d) 334, 339, is cited for appellees on this subject. In support of the principle as there stated we quoted from Walker on Patents (5th Ed.) to the effect that: "The absence of invention may be established in some cases, by evidence that a considerable number of persons who were not inventors, acting independently of each other, and without receiving any information from the patentee or his patent, did in fact contrive the improvement claimed therein, not long after he produced it." To the same general effect there was cited Concrete Appliances Co. et al. v. Gomery et al., 269 U. S. 177, 46 S. Ct. 42, 70 L. Ed. 222.

There is evidence in this record tending to indicate there was not that independence or separateness as between Crawford and the others as to invoke here the application of that rule. The evidence indicates that Crawford was lacking in funds, and that for some time before filing his application he sought to interest various concerns in his invention; and it is quite possible, under the evidence, that the somewhat sudden development of more or less similar devices for year round regulation of air flow for cooling water in automobile radiators was stimulated by Crawford's showing of his plans, and his undertaking to interest manufacturers therein, long before his patent was granted, and before even his application was filed.

It does not appear that Wright ever came into use. Indeed, there is evidence to indicate that about the time the license contract expired attempt was made to employ the Wright grids on some of General Motors' radiators, but without success.

We are satisfied that Crawford brought together a new combination of old elements which resulted in some advance over the prior art, and the determining question is whether this involved invention.

Had the controversy followed shortly after the granting of the patent, and without the experiences of the years intervening since Crawford's invention date, it is quite possible that our conclusion would coincide with that of the District Court, which found that invention was not involved. But it happens that since Crawford's filing date (September 18, 1916) things have transpired which must be considered in determining the doubtful question of invention.

It appears that prior to March 27, 1917, Crawford had assigned to appellant this application for patent, and a number of other applications for United States patents in the same field. Appellant had acquired also the above referred to United States patent No. 1,114,246, to Furber, October 20, 1914, for improvements in "temperature-controlling apparatus for internal-combustion engines," and also a number of other applications for patents for more or less similar devices.

Under date of March 27, 1917, appellant entered into a license agreement whereby, in consideration of a definite sum and of the royalties specified, it granted to Harrison Radiator Corporation, a subsidiary of General Motors Corporation, exclusive license under this and another Furber patent, and under seven pending applications for patents, each for a device showing alleged improvement in means for controlling the air intake to cool the water in automobile radiators. Four of these applications were by Crawford, including the application whereon the patent in question was issued. A scale of royalties applicable to cars of various prices was fixed, and it was stipulated that only one royalty should be paid for each car, even though more than one of the devices was employed thereon. The term of the contract was until the expiration date of the Furber patent —October 20, 1931.

It is not contended that upon expiration of this contract licensees thereunder were estopped from disputing the validity of any patents granted upon applications included within it and which remained in force after the contract expired. But the operations under such a contract may well have a bearing upon the question of whether any of the patents and applications which were its subject

matter involved invention. Appellees contend that the Furber patent was the main subject of the contract, and the applications only incidental and "thrown in for good measure." In appellees' brief it was well stated: "Had the Harrison Radiator Corporation negotiated a license specifically in the first instance with respect to the Crawford patent in suit alone, and had later attacked the validity of said patent after termination of the license such fact might, in a *doubtful* case, have a considerable evidential force and weight as an admission of the validity of the patent by the licensee. But the license being *predicated solely* upon the Furber patent, the Furber patent being the one that was wanted, and the seven pending applications being more or less thrown in, and this also not being in any sense a doubtful case, any implied admission contained in the act of accepting the license loses its weight."

That the main subject-matter of the contract was the Furber invention is quite apparent. But it is evident that as operations under the contract proceeded, the Crawford application whereon the co-patent in issue was granted rose in importance and loomed large in the estimate of the licensee. Indeed, it did not remain a mere incident to the Furber patent, but became the sole subject of a supplemental contract between the parties, wherein special license rates were arranged for this patent alone. This supplemental contract, dated November 30, 1927, made after ten years of operation under the original contract, dealt solely with this patent, and fixed a new and uniform royalty for all General Motors Corporation cars whereon manually operated devices of this Crawford patent were used.

The number of cars whereon the licensee paid royalty under the Crawford patent was nearly 2,000,000.

The selection of the Crawford device as the subject-matter for the supplemental contract after ten years of experience with all of the various devices of the original contract —nay, with the whole field of this art, wherein the Harrison Radiator Corporation, as a subsidiary of General Motors, and General Motors Corporation itself had long been such vast operators—quite persuasively suggests to nonexperts that something of invention must have resided in Crawford's combination. This reasoning finds strong reinforcement in the fact that upon expiration of the license contract appellees persist in employing the particular combination of Crawford rather than one of the many others which it is insisted are "just as good."

Whether for this purpose appellees employ other devices on some or many of their cars is not material. The fact that with their fourteen years of experience under the license contract, appellees, after its termination, still persist in using the Crawford device, tends quite convincingly to indicate that invention was involved in its origination.

Besides, it does not appear that, aside from this former licensee, there has been substantial resistance of the validity of the patent. The use of the device of the patent on nearly 2,000,000 cars by large producers, coupled with its continued use by them after the expiration of their license, would naturally stimulate other makers to appropriate it if they felt they might with impunity do so. That this has not been done suggests the general public recognition of and acquiescence in the patent's validity.

There is significance in a letter of November 8, 1920 (about two months after the Crawford patent issued), from Mr. Harrison, president of the Harrison Radiator Corporation, to Mr. Arvedson, of the patents department of the National Automobile Chamber of Commerce, saying:

"Thanks for yours of the 5th, advising that one of your members has been threatened with suit under the Crawford patent No. 1,352,184, for a radiator shield, owned by the Detroit Motor Appliance Company.

"I have not a copy of this patent by me, but I assume that it is the recent patent issued to Crawford, covering the placing of the radiator shutter in the radiator shell between the core and the front face of the shell. This patent has been in the office for some time; I have been aware of its existence, and read it through recently in Detroit.

"It appears to me to be a perfectly good patent, and covered broadly the placing of a shutter, whether thermostatically controlled or otherwise, in the extension of the radiator shell in front of the core face of the radiator. I doubt very much whether it could be infringed with impunity, and believe that the whole line of patents of the Detroit Motor Appliance Company, of which, as you say, we are sole licensees, are good and valid and very nearly of their face value."

In a letter dated September 19, 1916, patentee Furber, writing to appellant, said: "I am inclined to believe that you are right in that Mr. Crawford should be the sole applicant for a patent on the design shown in your photos, which by the way I think is a mighty good design. This idea of inclosing the slats inside of the shell is considerable different

than any idea I had in the respect that I contemplated a construction in which the slats were to be mounted on the outside and held in a frame independent thereof."

 With such apparently frank expressions made between much-experienced workers in this art, and without indication of intended deception or collusion in the communications, we who are unskilled in the art may accord probative value to such communications and acts in determining whether Crawford's combination showed invention and patentable advance over the prior art.

Believing as we do that under this record invention and patentable advance over the prior art appear, the decree of the District Court is reversed, with direction to enter a decree in favor of appellant finding the claims of the patent in issue to be valid and infringed, and awarding to appellant such further relief as it is in such case entitled to have.