## DETROIT MOTOR APPLIANCE CO. v. GENERAL MOTORS CORPORATION.
### No. 369.

District Court, E. D. Illinois.
Nov. 20, 1933.

Williams, Bradbury, McCaleb & Hinkle, of Chicago, Ill., for plaintiff.

Howe, Rademacher, Kreamer & Stalling, of Chicago, Ill., for defendant.

LINDLEY, District Judge.

In pursuance of the mandate from the United States Circuit Court of Appeals in this cause, 66 F.(2d) 319, this court issued an injunction against the General Motors Corporation et al., restraining the manufacture, sale, and use of the invention specified in claims 1, 4, and 8 of Crawford patent [No. 1,352,184] adjudged valid by that court. The reasons inspiring the injunction in the form in which it issued appear in memorandum of this court reported in 4 F. Supp. 529.

Subsequent to the issuance of the injunction plaintiff filed petition and affidavits seeking a judgment against General Motors Corporation for contempt in violation of the decree and writ. Citation duly issued, answer and affidavits of the respective parties were filed, and oral evidence was heard in open court.

It is the claim of plaintiff that defendant, General Motors Corporation, is in contempt of the injunction, first, with respect to the radiator shutter equipment being placed on Cadillac and La Salle automobiles now being manufactured by it; and, second, by the sale, use, and repair of, or replacement of parts for, Oldsmobile and Buick radiator shutter equipment substantially like the device 10 specifically adjudged by the Court of Appeals to infringe. This branch of the alleged violation is confined to trading in and reselling or repairing shutters on used Oldsmobile and Buick cars. There is no evidence that General Motors Corporation is now manufacturing Buicks and Oldsmobiles which make use of the infringing device.

The shutter equipment being used on Cadillacs and La Salles was not specifical-

ly before the court in the original trial, though such equipment has been used for a number of years. It becomes necessary, therefore, to determine initially whether this device is an infringement.

■ Of the three claims considered by this court and by the Court of Appeals in prior hearings, claim 1, the most general, reads as follows: "The combination with a radiator core, of a shell forming the regular outer finishing piece for said core, having an open panel for exposing the air and water tubes and being extended beyond the front plane of the same, and shutters mounted and operable within said shell between the front face thereof and the front face of the core."

Claims 4 and 8 are more specific in character, and include the element of attachment of the shutter to the shell of the radiator. Claim 1 contains no such specific limitation, and the invention adjudged valid by the Court of Appeals is not so limited. The court saw fit to adopt the definition of the invention framed by defendant in its brief on its appeal as follows: "The inventive concept of Crawford, therefore, was to take the old radiator consisting of core covered by a separate covering shell of sheet metal, admittedly old, extend the shell in front forward farther than it had been done previously, and mount in this forward extension of the shell in front of the radiator core, the shutter, which in closed position closed the front open panel of the shell and in open position exposed the air and water tubes of the radiator core to the air which might pass backwardly through the panel and the open shutters."

Thus it will be seen that the three elements in the combination declared to be an invention were: (1) A radiator core wherein water circulates; (2) a separate covering shell of sheet material giving a finished appearance to the radiator and hood, extended forward in front of the radiator core; and (3) a shutter capable of being opened or closed, mounted and operable within the extension of the shell between the front face thereof and the front face of the core. The Buick-Oldsmobile equipment before the court mounted the shutter upon as well as within the shell. The Cadillac-La Salle equipment mounts the shutter between the shell and the front of the core but, apparently, physically upon the core and not upon the shell, though an examination of the device discloses that the core and shell are so mechanically connected in the final ensemble as might make it proper to say that the completed assemble is mechanically equivalent to a device mounting the shutter upon the shell. However, for the purpose of disposing of the controverted question now submitted, the court will treat the Cadillac-La Salle construction as one mounting the shutter upon the core.

Defendant argues zealously that such a device is no infringement. It seeks so to read the specifications and claims of the patent and the opinion of the Court of Appeals as to lead to the conclusion that it is an essential element of plaintiff's device that the shutter be mounted upon the shell. I see no justification for such a conclusion and no basis for such an interpretation. Claim 1, adjudged valid, contains no such limitation. The definition of General Motors Corporation itself in the former hearing adopted by the Court of Appeals contains, and the opinion of the court reads into the claim, no such limitation. The Cadillac-La Salle device embraces each of the essential elements; namely, the core, the over extending shell, and the shutter mounted between the face of the shell and the face of the radiator. It reads clearly and specifically upon the invention as heretofore adjudged valid.

■ It is not the most satisfactory practice to bring before the court in contempt proceedings a device manufactured by defendant not attacked in the original hearing, though it had been previously manufactured. It is a preferred practice to have the question of such infringement presented in another form. However, the plaintiff has a right, if it sees fit, to proceed by means of contempt proceedings.

With the facts as the court finds them, there is no question but that there has been infringement in the manufacture of Cadillac-La Salle devices subsequent to the entrance of the injunction and service of the same, and that such infringement is continuing at the present time. Indeed, in its motion for stay of execution, the defendant General Motors Corporation used this language: "Your petitioner further represents * * * that it is a practical impossibility to stop the use of the patent charged to be infringed upon in this cause, without stopping the manufacture of cars in the Cadillac Division of General Motors Corporation and shutting down that industry or a large part thereof for several months in order to design and adapt a car that will avoid said patent. * * *"

It is true that defendant later insisted that such language was used by way of inadvertence, and now claims that the construction then admitted to be is not an infringement.

But in view of the fact that there is no justification for the claim of noninfringement, it would seem that the first impression, made a matter of record in the manner aforesaid, was the correct one.

Having been enjoined, General Motors Corporation attempted to procure a stay of execution, saying that as a result of the injunction its Cadillac factory would be closed. Stay having been denied and a further motion for the same relief having been denied by Mr. Justice Vandeventer of the Supreme Court, defendant continued to manufacture that which its counsel had previously intimated was an infringement. Such action does not spell good faith with the court. Defendant has been adjudged a trespasser. It may not with impunity continue its trespasses in the face of an injunction. It is clearly in contempt.

The shutter used on the Buick and Oldsmobile cars specifically considered by the Court of Appeals is no longer being placed upon cars now manufactured. It appears only on used cars produced prior to the issuance of the injunction. There is, however, evidence of replacement and repair of the device in old cars and the offer of resale of used cars, which have been traded in, which use the device. These instances are not numerous, but the proper inference is that they have occurred wherever and whenever radiator shutters needed repair or replacement on used cars in the regular course of business, or used cars were traded in on new cars and resold. These acts are clearly violations of the injunction unless it can be said that General Motors Corporation is not responsible therefor.

It is the claim of defendant that it sells such cars to the Buick-Oldsmobile-Pontiac Sales Corporation, which it entirely owns, and that such corporation in turn distributes the cars. It contends further that the Cadillac Motor Car Company, Buick-Olds-Pontiac Sales Company, United Motors Service, Inc., and various other corporations, which have done the specific acts complained of, are wholly owned subsidiaries for whose actions it is not responsible. Cadillacs, it is said, are manufactured by the "Cadillac Division" of the General Motors Corporation, while the "Cadillac Motor Company" is a sales company to whom the manufacturer sells the cars. The Cadillac division is apparently merely a factory branch of General Motors Corporation. In the Detroit telephone directory for June appears the listing of the Cadillac Motor Car Company, "factory and general office," at a certain telephone number and certain street number. There is no separate listing of "Cadillac Division" of General Motors Corporation. In its annual statement General Motors Corporation lists 75 companies, not including the sales companies. It states that these 75 companies comprise General Motors Corporation, and by uniting they can purchase materials at favorable prices, exchange engineering talent and pool manufacturing experiences.

Mr. Merrill, in the original case, stated that Olds Motor Works is a subsidiary owned by the defendant General Motors Corporation and controlled by it. He stated that his understanding was that the manufacture was conducted by Olds Motor Works, yet in other parts of the record it appears that Oldsmobiles are manufactured by the Olds Motor Works "Division" of the General Motors Corporation. The Operator's Manual, which the manufacturer places in each new Cadillac, bears the following: "Cadillac Motor Car Company." Nothing is said about Cadillac division. The manual is copyrighted by the Cadillac Motor Car Company, though it is now said that the car is manufactured by the Cadillac division and then sold to the Cadillac Motor Car Company. The implication is that the sales companies have the right to charge such prices as they see fit, yet the manufacturer states that cars are sold at certain standard prices, under factory regulation, indicating that the Cadillac division of the General Motors Corporation rather than the Cadillac Motor Car Company, under its factory regulations, controls the standard price. This is further borne out by other language of the same manual, which states that every purchaser of a car receives certain credentials from the Cadillac factory after the delivery of the car is reported by the distributor, indicating that the distributors immediately contact the General Motors Corporation, the manufacturer, through the Cadillac division, which is merely a factory branch.

In an exhibit to the Ooms affidavit appears a statement that the Cadillac Motor Car Company has been building fine motor cars exclusively. This is at variance with the statement that the cars are manufactured for the Cadillac Motor Car Company and that the Cadillac Motor Car Company is merely a sales organization. The exhibit is a booklet distributed to the public by the Cadillac Motor Car Company and General Motors Corporation.

There are various affidavits as to interviews with employees of the Cadillac Motor Car Company by whom statement was made that the company was a factory branch of General Motors Corporation. Salesmen at the Chicago branch of the Cadillac Motor Car Company stated that the place of business was a wholly owned factory branch of General Motors Corporation and entirely operated by that company. In various journals there are advertisements of Cadillacs over the name of Cadillac Motor Car Company, Division of General Motors Corporation. These advertisements state that inquiries addressed to the general sales manager will receive a prompt and confidential reply, but no address is given other than Cadillac Motor Car Company, Division of General Motors Corporation.

Buick-Olds-Pontiac Sales Company is said to be a wholly owned subsidiary which buys General Motors Corporation products and resells the same. It was organized in 1932 to function as the selling organization of the Buick division, Olds Motor Works and Oakland Motor Car Company which manufactures Pontiac, all wholly owned subsidiaries of the General Motors Corporation. Apparently the sale of the products of three of the subsidiaries was united in a new corporation wholly owned by defendant.

Another proper inference is that General Motors Corporation controls and dictates the policies of such subsidiaries, for if Buick-Olds-Pontiac organizations were each free and independent companies there would be no reason why the sale of all their products, which are competitive in character, should be lodged in one company.

Present officers of Buick-Olds-Pontiac are: President, I. J. Reuter; vicepresident, W. A. Blees; secretary, T. S. Merrill; and treasurer, M. L. Prentis; and directors are W. A. Blees, I. J. Reuter, Donaldson Brown, R. H. Grant, and Alfred P. Sloan, Jr. Mr. Reuter is also vicepresident, Mr. Merrill, secretary, Mr. Prentis, treasurer, Mr. Brown, vicepresident and chairman of the finance committee, Mr. Grant, vicepresident, and Mr. Sloan, president of General Motors, member of the finance committee and chairman of the executive committee thereof. Defendant says that Buick-Olds-Pontiac is generally controlled and operated by its own officers. If this is true, it is also true that they are likewise executive officers of General Motors Corporation.

United Motor Service is another wholly owned subsidiary which is said to have its own officers independent of General Motors Corporation, yet it is listed as one of the seventy-five companies comprising General Motors. Of its five directors, three are officers of General Motors Corporation, and Mr. Merrill and Mr. Prentis, secretary and treasurer of General Motors Corporation, are likewise secretary and treasurer of United Motors Service.

The cumulative effect of all the facts is to demonstrate rather conclusively to the court that each wholly owned subsidiary of the General Motors Corporation mentioned is merely a corporate agent for that company in the latter's operation and transaction of its general business. Each of them is engaged in the sale and distribution of its products. Each of them is directly controlled by its executive officers. The only corporate function of each of them is the promotion of the business of the General Motors Corporation as directed by the latter's officers in the distribution of its products. Entirely applicable is the language of Judge Killits in the case of Industrial Research Corporation v. General Motors Corporation (D. C.) 29 F. (2d) 623, 625:

"It is true that the mere fact that stockholders of two corporations are the same, with one exercising a control over the other through ownership of its stock, or through identity of its stockholders, does not make either the agent of the other; nor does a merger follow therefrom to the result that a contract or act of one becomes binding upon the other, where each corporation is separately organized under a distinct charter. Citation to support these propositions is unnecessary, for the parties to this controversy are in accord thereon. But the fiction of corporate entity may be disregarded, where one corporation is so organized and controlled and its affairs are so conducted that it is, in fact, a mere instrumentality or adjunct of another corporation. Matter of Watertown Paper Co. (C. C. A.) 169 F. 252; In re Muncie Pulp Co. (C. C. A.) 139 F. 546; Gay v. Hudson River Electric Power Co. (C. C. A.) 187 F. 12; Pittsburgh & Buffalo Co. v. Duncan (C. C. A.) 232 F. 584, 587; New York Trust Co. v. Carpenter (C. C. A.) 250 F. 668, 673; and for a late case, in which the authorities are summed up, Majestic Co. v. Orpheum Circuit, Inc. (C. C. A.) 21 F. (2d) 720, 724. * * *

"It is recognized that one corporation may be an agent for another corporation, and that by means of stock ownership one of such companies may be converted into a mere

agent or instrumentality of the other. United States v. Delaware, Lackawanna & Western Railroad, 238 U. S. 516, 529, 35 S. Ct. 873, 59 L. Ed. 1438, citing United States v. Lehigh Valley Railroad Company, 220 U. S. 257, 273, 31 S. Ct. 387, 55 L. Ed. 458. * * *

"The vast extent of the business of the General Motors Corporation and the variety of its enterprises are matters of such general notoriety, and the reasons why, to conduct such a diversified and extended business, it should employ corporate agencies, are so obvious, that little proof, if any, is necessary to hold the latter as mere adjuncts or agents, especially in the absence of any proof to the contrary; for the court might well take judicial notice of the extent of the business of such an extraordinary and notorious a corporation, as we may consider that of a great railroad enterprise having interstate activities, a doctrine which has already been adjudicated. * * * In our judgment, to permit such a corporation as the General Motors Corporation to escape direct responsibility for the invasion of patent rights in any district other than that of its residence by subsidiaries acting wholly in its interest, as those whose managers are herein served, and to hold that it may be saved from responsibility for wholesale infringements, by these and other subsidiaries, unless by suit in the district of its residence, and then only by proof that it alone, independent of its subsidiaries, carried on the objectionable practices, or, as the only alternative, to sue its subsidiaries, including the other moving defendants, wherever they may be severally found directly and actively engaged therein, would be intolerable. It is against sound policy, when a corporation has grown so large, and it has entered into activities so various and so generally distributed, that it finds itself compelled to operate through many subsidiaries, doing nothing directly itself in carrying on its business, to permit it to enjoy exclusively the fruits of such subsidiary activity and to escape the concomitant responsibilities flowing therefrom."

■■ This decision is in line with the general rule in such cases to the effect that where stock ownership control of a subsidiary corporation is resorted to, not for the purpose of participating in the affairs of the corporation in the normal and usual manner of a stockholder, but for the purpose of so controlling a subsidiary company that it becomes a mere agency of the owning company, the latter may not escape liability for the acts of the subsidiary. Corporations may be agents of other corporations just as readily as individuals, and apparently it is much more feasible for General Motors Corporation to have corporate agents with widespread organizations than to have individual agents with their natural human limitations. Chicago, Milwaukee & St. P. Ry. Co. v. Minneapolis Civic & Commerce Ass'n, 247 U. S. 490, 38 S. Ct. 553, 62 L. Ed. 1229; Gulf, C. & S. F. Ry. Co. v. Cities Service Co. (D. C.) 281 F. 214; U. S. v. Lehigh Valley, 220 U. S. 257, 31 S. Ct. 387, 55 L. Ed. 458; Wabash Ry. Co. v. American Refrigerator Transit Co. (C. C. A.) 7 F.(2d) 335.

The control of General Motors Company over such subsidiaries is shown by the instructions of the parent company to the subsidiaries with regard to this case. After the contempt proceedings were instituted General Motors sent to its subsidiaries written directions that they "must not offer for sale or sell either used cars or new cars of the above mentioned models." Such is plain assumption of authority over the subsidiaries. It is not a request, but a demand.

■ I am of the opinion, therefore, that General Motors Corporation is in contempt of the decree of this court, entered under mandate of the Court of Appeals, both with regard to its direct manufacture of devices mounted on Cadillacs and La Salle automobiles in the present course of manufacture and in the trading in and resale of used Oldsmobile and Buick cars containing the infringing device, by its wholly owned and controlled subsidiaries, and in the replacement and repair of such equipment by such subsidiaries.

■ Plaintiff has filed an affidavit herein showing that its expense for the gathering of evidence and preparation for hearing of the contempt proceedings is $7,991.03. Though General Motors Corporation claims it desires not to violate the injunction, its original application for stay included a statement that the enforcement of the injunction would necessitate ceasing of manufacture of Cadillacs and La Salles. The later actions of defendant, considered in connection with such a statement, indicate a rather contemptuous attitude.

It is not the desire of the court to be unduly harsh, but I am of the opinion that defendant should compensate plaintiff at least partially for the costs that its acts have brought upon plaintiff. Accordingly, General Motors Corporation will be fined in the sum of $6,000 to be paid to plaintiff as compensation.