## JACKMAN v. NEWBOLD.*

Circuit Court of Appeals, Eighth Circuit.
July 16, 1928.

No. 7984.

*Rehearing denied September 24, 1928.

Justin D. Bowersock, of Kansas City, Mo. (C. A. Smart, of Lawrence, Kan., and J. L. Hunt, of Topeka, Kan., on the brief), for appellant.

Charles M. Miller, of Kansas City, Mo., for appellee.

Before LEWIS and KENYON, Circuit Judges, and KENNEDY, District Judge.

KENYON, Circuit Judge. Appellee, as plaintiff in the trial court, brought action in equity to compel appellant to account for and to deliver to, him, as receiver of the Young Construction Company (hereinafter called the construction company), certain bonds in his possession, issued by the city of Miami, Okl., to said company, in payment for pavement constructed in said city, or, as alternative relief, judgment for the reasonable value of said bonds.

Appellant, who was a director of the construction company, bases his claim to the bonds or their proceeds on an alleged equitable lien thereon for advancements made by him to the construction company to carry on the work of paving at Miami, and also by virtue of a certain alleged settlement and contract between appellant and the construction company, by the terms of which appellant was to accept Miami bonds at 80 cents on the dollar in payment of both the secured and unsecured indebtedness of the construction company to him, and was to release the balance of the bonds above the amount necessary so to do. Similar suits to this were brought against three other directors of the construction company. The trial court referred the matter to a master, who took the evidence and made findings of fact and rendered conclusions of law. These cases against the other directors are not here, having either been adjusted or being in process of adjustment. The master found against appellant as to $40,475.63 of said bonds, face value, and in appellant's favor as to the balance of the bonds which he had in his possession, and recommended decree in accordance with such finding. Exceptions were filed by both parties, and the trial court sustained the master's findings and conclusions, and entered decree in accordance therewith. Briefly the facts are as follows:

The A. R. Young Construction Company was a corporation under the laws of Kansas, engaged in general contract work with reference to construction and paving of roads and streets. The only activities carried on by said corporation which appear from the record were the Miami paving contract and a contract with a road district at Clarksville, Ark. It entered into an agreement with the Dunne Investment Company, of Wichita, Kan., to take at 95 cents on the dollar the bonds issued by the city of Miami to the construction company from time to time as the work of paving progressed. The Dunne Company took some $350,000 of said bonds at 95, but shortly before July 2, 1920, refused to take more. The total issue of the Miami bonds was about $600,000. The construction company had little working capital, most of its assets being invested in equipment, and when the Dunne Company refused to further take bonds the construction company was unable to borrow money in the money market, and four of the directors, appellant being one, advanced in proportion to their stock holdings funds to carry on the work of the company. Appellant advanced $34,369.12, which, with interest, is the amount involved in this controversy. Unsecured notes were given by the construction company to the directors for the sums advanced. No security was taken, nor was there any specific contract or agreement between the construction company and the directors that they should be paid in Miami bonds, or out of any particular fund that might accrue to said construction company.

July 2, 1920, the construction company, being in further need of money to carry on its business, made a written contract with appellant whereby he agreed to furnish to the construction company $75,000, at the rate of $10,000 per week, he to receive notes bearing 10 per cent. interest and a commission of 2½ per cent. upon the moneys advanced. $20,000 of the Miami bonds then in his hands, together with all other bonds thereafter to be issued by the city of Miami, were to be retained by him as collateral security for the money to be advanced by him in the future. Under this arrangement he advanced $76,000, which on the 28th day of April, 1921, amounted, with interest and commissions, to $83,806.10, and he held at that time as collateral security to such loan bonds of the city of Miami of the face value of $205,-013.09.

The road district in Johnson county, Ark., which was the seat of the other work, found itself unable to go on with the work, and that contract was only about one-third completed.

At a meeting of the board of directors of the construction company on the 14th day of October, 1920, Mr. Young, president of the company, was instructed to sell the company's property and equipment in Johnson county, Ark., and arrangement was made at the same time to sell the machinery of the company at Miami, Okl., to said Young; he to assume the pay roll of the company. Thus the construction company commenced the process of winding up its affairs. At the stockholders' meeting of January 17, 1921, where appellant was again elected a director, the following action was taken:

"It was moved that the directors of the company proceed to sell and dispose of all assets of the company, pay its obligations as far as possible, and wind up the affairs of the company, and when all business matters of the company are disposed of to proceed to dissolve the corporation."

No new contracts had been taken by the construction company subsequent to the action of the board of directors of October 14, 1920. On the 23d day of April, 1921, the board of directors received a bid from William Dockum for $100,000 of Miami bonds at a flat rate of 80. This bid was rejected. April 26, 1921, four of the directors, including appellant, made written proposals to the construction company that they would accept Miami bonds at 80 cents on the dollar in payment of the money theretofore loaned to the company evidenced by unsecured promissory notes. At this time a large amount of general debts, outside of those

owing to the directors, had accumulated against the company. Suits had been brought and attachments issued against its property, and this was the condition of the construction company when a special meeting of the board of directors was called for April 28, 1921. It appears that at this meeting the four directors, including appellant, who had prior to July 2, 1920, loaned money to the construction company, were present, and with them was Mr. Ord Clingman, also a director of and attorney for the company. These directors voted to accept the proposal which the four directors had submitted, thus satisfying their unsecured indebtedness by the receipt of Miami bonds, at a flat rate of 80 cents on the dollar. Under this arrangement appellant would receive $145,036.14, par value, of the Miami bonds, of which $104,757.63, at 80, were sufficient to satisfy his secured debt; $40,278.51, the unsecured debt. After doing this there remained Miami bonds of the face value of $15,232.95, which later were sold to Mr. J. D. Bowersock for 75 cents on the dollar, without accrued interest.

The construction company for a considerable period kept no proper books, and the master found it impossible to ascertain the exact assets or liabilities of the company as of April 28, 1921; but it would seem that the company at that time owed at least $95,000 to other creditors than the directors, and that it had no cash or bonds, except the bonds in the hands of appellant in the amount of $205,013.09 to secure him for the $76,000 advanced under the agreement of July 2, 1920. The debts of the company at the time of the January, 1921, stockholders' meeting, according to witness Clingman, were about $300,000; according to Young, $210,000. It does not appear that they were any less on April 28, 1921. In any event, after the sale of the property by the receiver, there remained about $50,000 of debts due general creditors. After the April meeting of the directors there was no further meeting until November 2, 1921.

On December 31, 1921, appellant Jackman commenced suit in the state court of Kansas for a receiver, alleging that there was "imminent danger of insolvency, for the reason that the affairs of the corporation have been and are now being mismanaged; that there was a judgment against the company for $5,000; that there are outstanding bills and accounts receivable; that the directors are busy men, and are not giving attention to the management of the Young Company that its importance demands; that at the reg-

ular stockholders' meeting on January 17, 1921, the stockholders recognized the failing condition of the defendant corporation and the utter futility of longer running said corporation as a going concern, and voted to dissolve the corporation; that no steps have been taken since said date to carry out the resolution of the stockholders." The state court appointed a receiver, who was discharged May 28, 1922. Warren Bros., one of the heavy creditors, then instituted a creditors' suit in the United States District Court for the District of Kansas, and appellee Cecil L. Newbold, was appointed receiver of the Construction Company.

No question is made as to the decision of the court regarding the bonds turned over to appellant in the sum of $104,757.63, face value, as payment for the $76,000 loan. The entire controversy is as to the right of appellant to hold Miami bonds, or the proceeds thereof, as payment for his unsecured loans to the construction company. While the exact time these loans were made does not appear in the record, it was prior to July 2, 1920. The master found as follows:

"On April 28, 1921, the A. R. Young Construction Company being in a failing condition and having ceased to do business and no longer a going concern, but being in process of liquidation, the officers and directors thereof including these defendants held such fiduciary relations to all the general creditors of said corporation that they could not legally give a preference to themselves, as they did by paying themselves in the bonds of the city of Miami, Okl., and the acts of the directors in so distributing such bonds of the company to themselves in the payment of debts due them are void as against the rights of all other general creditors of the corporation."

It is apparent from this record that at the time of the arrangement made by the directors on April 28, 1921, to satisfy their unsecured indebtedness, the construction company, if not entirely insolvent, was so near it that the difference is not discernible. The master found: "At all times after the meeting of its board of directors on October 14, 1920, said A. R. Young Construction Company was in process of liquidation. It took no new contracts—entered upon no new business. It was no longer a going concern, and its officers were engaged in closing up its affairs with a view to the dissolution of the company." Also: "I find that on the 28th day of April, 1921, said company was in a failing condition, had ceased all business, and was in process of liquidation, with the purpose of immediate dissolution."

After January 17, 1921, under the resolution adopted by the stockholders, the business of the construction company was in process of liquidation. If it was a going concern after that time, its only going was toward bankruptcy. It never in fact had any substantial working capital, and was, as Director Esterly testified, doing business "on a shoestring." Apparently its only source of substantial revenue was the Miami paving job. The road district work in Arkansas was not productive of financial results. The stockholders by the resolution of January 17, 1921, had recognized the failing condition of the company. Jackman's petition for receiver in the latter part of 1921 refers to the company's danger of insolvency. Appellant insists that the corporation was not in an insolvent condition on April 28, 1921, and sets forth a statement showing a paper solvency, which includes as assets anticipated profits, a doubtful suit against Dunne & Co. for damages for its failure to take the Miami bonds as agreed, exaggerated value of equipment in Johnson county, Ark., amount due from Young for material sold, without any showing that Young was solvent, and other questionable items. Under all these circumstances, it is apparent that the meeting of the directors of April 28, 1921, had but one object, and that was, in view of the approaching insolvency of the construction company, to prefer themselves out of the best assets and leave for the other creditors, outside of a small amount of Miami bonds, uncertain and doubtful assets, consisting of secondhand machinery, an uncertain lawsuit, and other equally speculative and unproductive matters.

This proceeding by interested directors, who at the time were charged with the liquidation of the affairs of the failing corporation by direction of the stockholders, which resulted in preferring themselves and securing payment of their unsecured claims, leaving little, if anything, of substance to pay the general creditors, was rather a bold and bald proceeding, and in the light of this record cannot stand in a court of equity. Appellant, for unsecured loans to the construction company prior to July 2, 1920, was entitled to no preference over other general creditors, unless an equitable lien as to the proceeds of the Miami bonds existed, which we shall hereinafter discuss. The action of these directors was not an effort to tide over the affairs of the construction company, in order to carry on business in the present or in the future, for the company was going out of business and was practically in liquidation, in accordance with the resolution of the stockholders. If the assets of the construction company

were as ample as now contended, it would not have been necessary to protect themselves to take such action.

That directors of a corporation may in good faith advance money to keep a corporation a going concern, and take security therefor of corporation property, if the transaction is an open and fair one, and the good faith intent is to benefit the corporation and not the directors, is well established. Twin-Lick Oil Co. v. Marbury, 91 U. S. 587, 23 L. Ed. 328; In re Lake Chelan Land Co. (C. C. A.) 257 F. 497, 5 A. L. R. 557.

However, where a corporation is insolvent in fact, or so nearly so that insolvency is practically certain, director creditors should not be permitted to appropriate the assets of the corporation to secure or pay a past indebtedness to the prejudice of other creditors. Mr. Clingman, attorney for and director of this company (whom we do not include in our reference to the action of the directors, as he was in a different situation), notified the directors, at the meeting where they were engaged in preferring themselves, that their action in paying themselves out of the Miami bonds before the other creditors were settled with might be questioned. They knew, therefore, from the counsel of the construction company, that their action was questionable, but such knowledge did not deter them. After the directors' meeting of April 28, 1921, when the four directors satisfied their own claims against the company, they apparently lost interest in its further management, as appears from the allegations of appellant's petition in the state court for a receiver, hereinbefore set out.

The law applicable to this situation is not difficult. It is merely common sense and common honesty, applied in the interest of fair dealing. In the vigorous opinion of Judge Philips in Northwestern Mut. Life Ins. Co. v. Cotton Exchange Real Estate Co. (C. C.) 70 F. 155, 161, he said: "A sound public policy, in my judgment, demands that when a business corporation has reached a point in its affairs when its directors know that it cannot pay its debts, and for the lack of sustenance, cannot longer do business, or cannot 'act up to the design of its creation,' it is then, to all intents and purposes, insolvent. In such conjuncture its directors ought not to be permitted to take advantage of their position as managing officers to appropriate its remaining assets to the payment of their unsecured debts, to the exclusion of other unsecured creditors. Until overruled in this judgment, I shall continue to so administer the law." This court in Stuart v. Larson

et al., 298 F. 223, 38 A. L. R. 79, reviewed the authorities and indorsed this language of Judge Philips. In Sutton Manufacturing Co. v. Hutchinson (C. C. A.) 63 F. 496 (opinion written by Justice Harlan as Circuit Justice), it is said: "Of course, in cases of that kind, a court of equity will closely scrutinize the transaction, and, in a contest between general creditors and a director or managing officer who takes a mortgage upon its property, will hold the latter to clear proof that the mortgage was executed in good faith, and was not a device to enable him to obtain an advantage for himself over those interested in the distribution of the mortgagor's property." See, also, American Exch. Nat. Bank of New York City v. Ward et al. (C. C. A.) 111 F. 782, 55 L. R. A. 356; Wyman v. Bowman et al. (C. C. A.) 127 F. 257; Thomas v. Brownville & C. R. R. Co., 109 U. S. 522, 3 S. Ct. 315, 27 L. Ed. 1018; Railway Co. v. Ham, 114 U. S. 587, 5 S. Ct. 1081, 29 L. Ed. 235; Richardson's Executor v. Green, 133 U. S. 30, 10 S. Ct. 280, 33 L. Ed. 516; Taylor v. Mitchell, 80 Minn. 492, 83 N. W. 418; Williams v. Turner et al., 63 Neb. 575, 88 N. W. 668.

In this case the situation is more aggravated than in many of the foregoing cases, in that liquidation of this corporation had been voted in January, 1921, and these directors were charged with carrying out the liquidation as agents of the stockholders. The rule as to this is stated in 14a Corpus Juris, p. 1148, § 3801, as follows:

"Notwithstanding the rule which permits preferences to be made by a corporation, after proceedings for dissolution have been instituted the corporation has no power to make payments to certain creditors in preference to others, or to otherwise make such preferences, nor can a preference be made under these circumstances, even though the corporation is solvent."

We pass to the question of whether appellant had an equitable lien on the Miami bonds or their proceeds for the loans or advancements made prior to July 2, 1920. On this subject the master found that no agreement existed between the construction company and the directors that they should be paid out of these bonds or out of any particular fund of the construction company. On this subject the trial court, in reviewing the findings of the master, said:

"As this is a creditors' suit for the benefit of all creditors of the company, equity and justice demand that the bonds so taken by defendants, or their value, shall be returned to the company, and all simple con-

tract creditors share alike, unless the principal contention of the defendants that they had an equitable lien on the bonds by them received from the company is sustained by the proofs. The master finds no such lien to have existed; that all defendants save Jackman had any lien or claim on any of the bonds, save for the $76,000 and interest he advanced under the agreement, he should take and hold as collateral for money theretofore by him furnished all the bonds then due the company; but as to the money theretofore by him and the other defendants advanced to prosecute the business of the company, no lien or other equity existed superior to the rights of other simple contract creditors, and that it would be unjust and unequitable to allow them as officials of the company to pay themselves and leave other creditors go unpaid. In this I am clearly of the opinion, from the proofs and on his record, the findings of the master are right, and must be sustained."

■ An equitable lien may be established by verbal agreement. The intention to charge the particular property with a lien as security for the debt, or that the fund derived from the sale of the property shall be likewise charged with a lien, must clearly appear. Great Northern State Bank v. Ryan (C. C. A.) 292 F. 10. A mere expectation that a debt will be paid out of some particular fund when the fund arises, or even an agreement to that effect, does not establish an equitable lien upon the fund. The Supreme Court of the United States has held that "an agreement to pay out of a particular fund, however clear in its terms, is not an equitable assignment." Christmas v. Russell, 14 Wall. 69, 84, 20 L. Ed. 762.

In Jones on Liens, vol. 1, § 48, it is said: "A mere agreement, whether by parol or in writing, to pay a debt out of a designated fund, when received, does not give an equitable lien upon that fund, or operate as an equitable assignment of it. The agreement is personal merely."

In section 50 of the same work it is said: "To constitute an equitable lien on a fund, there must be some distinct appropriation of the fund by the debtor, such as an assignment or order that the creditor should be paid out of it."

In section 52 of the same work: "The promise of a debtor to pay a debt out of a particular fund is not sufficient. There must be an appropriation of the fund pro tanto, either by giving an order on the specific fund, or by transferring the amount otherwise in such a manner that the holder of the fund is authorized to pay the amount directly to the creditor without the further intervention of the debtor."

See, also, Wright v. Ellison, 1 Wall. 16, 17 L. Ed. 555; Franklin v. Browning (C. C. A.) 117 F. 226; 19 Am. & Eng. Ency. of Law (2d Ed.) 16.

There was an entirely different situation as to the $75,000 loan and the loans prior to July 2, 1920. Evidently neither Jackman nor the other directors intended there be any lien for the loans prior to July 2, 1920, as they subsequently voted authorization for the $75,000 loan from appellant with the Miami bonds pledged as security therefor. If these bonds were ever intended to be security for the former loans, surely the directors would not have taken this action and deprived themselves of security therefor. Undoubtedly it was expected that these loans would be paid out of the proceeds of the Miami bonds. That was the chief, if not the only, source of revenue; but there was no agreement, either express or implied, so to do. At the time of these advancements the construction company was a going concern, although without much working capital, but evidently in better financial condition than at the time of the arrangement for the $75,000 loan. Other creditors who furnished material for the work at Miami undoubtedly expected to be paid out of the proceeds of the bonds, and their equities in that respect are fully as strong as the equities of the appellant.

■ The evidence cited by appellant to establish the claimed equitable lien falls far short of the necessary requisites. It does not show any such intention on the part of the directors. The testimony of Mr. Young and Mr. Clingman, the attorney for the company, is cited by appellant to sustain the proposition that the directors advanced a part of the necessary cash to keep the company going, with the understanding that, when the expected purchaser, Dunne, took the bonds, they would be reimbursed from the proceeds. We refer to some of this cited evidence.

During the testimony of Mr. Young, the master asked: "Q. Isn't it your understanding that those men advanced that money under the supposition that as soon as those bonds came in they should be paid in bonds, from those bonds of Miami, temporarily loaned for the purpose of tiding you over?

To which the witness, Young, responded: "A. *There was nothing mentioned specifically on that point;* none of the directors wanted bonds. It was supposed, when they advanced

the money, that Dunne & Co. would be in position to continue with the contract."

"Q. What was the result of that? A. That this money would be returned."

The following appears in the examination of the witness Clingman:

"Q. Was there anything said about when they should be paid back, in all of your discussions? A. I don't remember any definite conversation as to when they would be paid back.

"Q. Was there any conversation that wasn't definite, as to when these men might expect their money back? A. *When we got the bonds and other assets liquidated.*

"Q. That was the general consensus of opinion? A. Yes."

It therefore appears that the general idea was that the directors would be paid when they "got the bonds and other assets liquidated." While the doctrine of equitable liens is broad and comprehensive, it is not broad enough to cover the case made by this record. There is no reason to disturb the master's finding, approved by the trial court, that no equitable lien existed on the Miami bonds for the advancements made by appellant prior to July 2, 1920.

Appellant insists that the contract made by him with the construction company to accept Miami bonds at 80 cents on the dollar for his entire debt of $116,000 was one in entirety; that the master and the trial court have made a new contract for him, and that thereby he may receive less than par for his secured obligation, stating in the brief that "this contract itself recites that the best offer the company had been able to get for the bonds was 60 flat," and that at 60 flat it would have taken $140,000 of bonds, par value, to pay defendant's secured debt, and that he has been denied the benefit of his contract.

The court allowed him to retain for his secured debt face value Miami bonds of $104,758.63, which at 80 cents on the dollar was adequate to satisfy the secured debt. The statement in relation to the company being able to secure only 60 flat for the bonds appears in the letter of April 26, 1921, from Jackman & Jackman to the Young Construction Company (Exhibit B, Record 10). The same letter appears at page 45 of the record, and recites that the best offer on said bonds is 80 flat. Evidently the statement as to 60 flat is an error in the record. In the condensed statement of the record appears the following: "Counsel for plaintiff and defendant further agreed that the allegations in defendant's answer to the effect that at

the time of the meeting of the board of directors of the A. R. Young Construction Company on April 28, 1921, the Miami paving bonds in question were reasonably worth eighty (80) cents on the dollar, are true."

In the answer of appellant in this case appears the following: "Said 80 per cent. was at that time the full and fair market value of said bonds." Docking made an offer of 80 flat for $100,000 of these bonds on April 21, 1921, which the directors refused to accept. The master found that 80 cents on the dollar on the face of the bonds was full market value thereof on the 28th day of April, 1921, and the record fully sustains such finding. There is no basis for the argument that under the decree the defendant, being forced to retain bonds at 80, will receive less than par for his admittedly secured obligation.

It is also insisted that the contract between appellant and the construction company cannot be set aside and restoration of bonds decreed without a tender or offer to return to defendant that which he parted with thereunder. Appellant is in no position to demand that something be returned to him to which he is not entitled as a prerequisite of a suit in equity to compel him to return to the receiver of the construction company bonds owned by it which he had no right to retain. Nor could it well be contended that appellee was under the necessity of tendering back the bonds released in excess of those necessary to liquidate the preferred debt of $75,000, in view of the fact that appellant participated in the arrangement of the directors by which most of these bonds passed into their hands. The construction company was in no position to tender back those bonds, and certainly it was not obligated to do an impossible thing.

The trial court has not made a new contract for appellant and forced him to accept it. It has merely refused to sustain certain parts of a contract entered into under the circumstances disclosed by this record. Appellant as to his unsecured loans should take his place with the other general creditors and receive his fair pro rata. To permit an arrangement by the directors of a failing, if not an absolutely insolvent, corporation, whose stockholders months before had voted to liquidate the business of the corporation, to appropriate most of the assets of the company in payment of their own unsecured debts, thus according themselves preferential treatment at the expense of the other general creditors, would be in equity an abhorrent proposition.

The findings of the master, sustained by the trial court, are of great probative force. We are in entire accord therewith, and the decree of the trial court is affirmed.