## CERTAIN–TEED PRODUCTS CORPORATION v. WALLINGER et al.

## WALLINGER v. CERTAIN–TEED PRODUCTS CORPORATION.

### Nos. 4088, 4089.

Circuit Court of Appeals, Fourth Circuit.

April 6, 1937.

---

William A. Stuart, of Abingdon, Va., and Howard C. Gilmer, Jr., of Pulaski, Va. (Howard C. Gilmer, of Pulaski, Va., on the brief), for Wallinger and another.

J. P. Buchanan, of Marion, Va. (William B. Shealy, of New York City, on the brief), for Certain-teed Products Corporation.

Before PARKER, NORTHCOTT, and SOPER, Circuit Judges.

SOPER, Circuit Judge.

These appeals grow out of a suit brought against the Certain-teed Products Corporation, a Maryland corporation, by G. J. Wallinger, trustee in bankruptcy of the Beaver Products Company of Virginia, and Charles Hull Ewing, trustee, to whom the last-mentioned corporation had mortgaged its mines, plant and properties situated at North Holston, Va., for the purpose of securing a bond of $350,000 under date of January 1, 1927. Originally brought in the state court, the suit was removed to the federal court on the ground of diverse citizenship. For convenience, the corporations will be called herein Certain-teed and Beaver respective-

ly. In the month of April, 1928, Certainteed, a corporation engaged on a national scale in the production and sale of plaster and gypsum products, became the virtual owner of Beaver by the acquisition of all of the preferred and two-thirds of the common stock, and thereafter controlled its property and business. The burden of the suit is that the defendant operated the Beaver plant wastefully and destructively, so that the mines were depleted and the value of the security of the bondholders was impaired if not destroyed; and also that the defendant, having concluded to abandon the Beaver properties, proceeded by tortious practices to destroy the good will and business of the company and cripple it as a future competitor. Pursuant to these purposes, the trade-marks, copyrights and trade-names of the Beaver Company were presented to the building trades in the territory served by Beaver, or converted to Certainteed's use; and also certain insurance moneys, bank balances, and other personal property of Beaver were transferred to Certain-teed to the detriment of the bondholders and other creditors of Beaver. In the District Court the plaintiffs failed in their claims in respect to the first three items of the claim which related to wasteful mining, injury to the good will, and wrongful use of the trade-marks and copyrights of Beaver; but obtained a directed verdict as to the remaining items except one, and as to that, won a verdict from the hands of the jury. Both parties appealed, the appeal of the plaintiffs being taken only by the trustee in bankruptcy of the Beaver Company, since all of its assets were being held by him for the benefit of all of the creditors, including the bondholders as their interests might appear; but in the appeal of the defendant, both plaintiffs were joined.

■ It will be convenient first to dispose of the appeal by the trustee in bankruptcy. (No. 4089.) In our opinion, this appeal must be dismissed for a reason which has no bearing upon the merits of the points involved. At the conclusion of the evidence the court upon motion of the defendant directed a verdict in its favor with respect to the first three items of the plaintiff's claims and excluded the same from the consideration of the jury. At the same time the court directed a verdict against the defendant on certain items, and submitted to the jury another item for their consideration, all of which will be hereinafter described.

But the verdict rendered was confined to those items which had been directed in favor of the plaintiffs and to the item submitted to the jury's consideration, no mention being made of the items which the judge had decided in favor of the defendant with the result that no verdict or judgment was rendered thereon. It follows that this court has no power to consider the last-mentioned items, for appeal to it lies only from a final decision rendered by the District Court. United States v. Long Branch Distilling Co. (C.C.A.) 262 F. 768.

### Case No. 4088.

■ At the outset of the case, the defendant endeavored to secure an order quashing the service of process upon it through a motion to quash and a plea in abatement. Two contentions were made: (1) That proper process was not served or returned by the sheriff in the state court; and (2) that the defendant was not doing business in Virginia. Section 3845 of the Virginia Code of 1930 provides that a foreign corporation doing business in the state of Virginia shall by power of attorney appoint the secretary of the commonwealth and his successors in office as its agents upon whom all process against the company shall be served. Section 6064 provides that process against a foreign corporation shall be served on the statutory agent, if any, of such corporation; but if there be no statutory agent, the process may be served on any other agent of the corporation in the county or city in which he resides or does business. Section 6066 provides that service on any person other than a statutory agent shall be by delivering to him a copy of the process in the county or city wherein he resides or does business or the principal office of the corporation is located; "and the return shall show this, and state on whom and when the service was; otherwise, it shall not be valid." The return of the sheriff in this case showed that the process was executed on the defendant by serving the same on J. W. Austin, agent of the defendant in Smyth county, Va., where he resided.

The defendant contended that the return was invalid because it did not show on its face that the defendant had no statutory agent or that the defendant was doing business in the state. It is fair to assume that if the defendant had a statutory agent in Virginia, it would have been quick to prove it in support of its motion; and there is

nothing in the record to indicate that such an agent existed. The contrary would seem to be true because the defendant claimed that it was not doing business in Virginia at all. Nevertheless the defendant insists upon the point, relying upon the rule, for which considerable support is found in the decisions, that when a statute provides that if certain agents or officers of a foreign corporation cannot be found in the state, process may be served upon some other person, the return must show that the persons previously enumerated could not be found or service upon such other person will be invalid. See Willey v. Benedict Co., 145 Cal. 601, 79 P. 270; St. Louis & S. F. R. Co. v. Loughmiller (D.C.) 193 F. 689; Southern Bldg. & Loan Ass'n v. Hallum, 59 Ark. 583, 28 S.W. 420; Adkins v. Globe Fire Ins. Co., 45 W.Va. 384, 32 S.E. 194; Venner v. Denver Union Water Co., 40 Colo. 212, 90 P. 623, 122 Am.St.Rep. 1036; Constantine v. Bennett's Travel Bureau, Inc. (Sup.) 186 N.Y.S. 73; Southern Express Co. v. Hunt, 54 Miss. 664; Seacoast Lumber Co. v. R. J. & B. F. Camp Lumber Co., 63 Fla. 604, 59 So. 13; Fletcher Cyc. Corp. § 8782; 21 R.C.L. p. 1361; 14A C.J. 1419. Compare Maichok v. Bertha-Consumers Co. (C.C.A.) 25 F.(2d) 257.

The District Judge overruled these contentions, we think properly, on the ground that section 6066, having expressly specified what the return shall show when service is made on any person other than the statutory agent, no further statement is necessary. The matter is one within the knowledge of the defendant; and in any case, the defendant can easily secure the protection of the statute by showing the fact. For like reasons we do not think that the return should show that the defendant was doing business in the state. The return in the pending case follows the language of the statute and in the absence of a controlling decision by the Virginia courts, we deem it to be sufficient.

■ Little need be said as to the point that since section 3845 of the Virginia Code is a later statute than section 6064, and provides that all process against a foreign corporation shall be served upon the secretary of the commonwealth, that portion of section 6064, which permits service upon another agent, if there be no statutory agent, is no longer in effect. Section 6064 was not expressly repealed by section 3845 and the two sections can be read together without inconsistency. It is past belief that the Legislature of Virginia, while requiring every foreign corporation doing business in the state to authorize the secretary of the commonwealth to receive service of process on its behalf, intended to relieve every such corporation which failed to obey the statute from suit by citizens of Virginia in the courts of the state. The only reasonable interpretation of the statutes is that service is to be made upon the secretary of the commonwealth if he has been authorized by the corporation to accept it, but otherwise upon some other agent of the corporation residing or doing business in the state as provided in section 6064. Furthermore, section 3847 provides among other things that a foreign corporation as a condition precedent to doing business in Virginia, must have an office in the state at which claims of residents may be presented or must deposit securities with the treasurer of the state for the protection of Virginia patrons. Such a corporation must also execute the power of attorney as required in section 3845, and pay the statutory fees and obtain from the State Corporation Commission a certificate of authority to transact business in the state. Section 3848 (as amended by Acts Va.1932, c. 222) in prescribing the penalties for doing business without this certificate states: "The officers, agents and employees of any such corporation doing business in this State without such certificate of authority, or when such corporation is in default under the provisions of this and the preceding section * * * shall be personally liable to the State for any fines imposed on it, and to any resident of the State having a claim against such corporation, * * * and service of legal process upon any of said officers, agents or employees within this State shall be deemed sufficient service on the corporation."

■ The District Judge also gave careful consideration to the defendant's contention that it was not subject to suit in Virginia because it was not doing business in the state, and that Austin was not the kind of agent upon whom process could properly be served. By agreement of counsel, the evidence on the point was submitted to the District Judge for decision. He overruled both contentions. The facts are that prior to July 5, 1932, when a receiver was appointed in the state court for the property of the Beaver Products Company of Virginia at North Holston, Va., that corporation was a subsidiary of Certain-teed. The directors and trustees of the two corpora-

tions were very largely identical. They occupied the same office in New York City from which the operations of both were directed. J. W. Austin had been superintendent of the Beaver plant for years and was continued in that position after the Certain-teed took control in April, 1928.

On April 19, 1932, when the prospects of business were unfavorable and the Beaver plant was heavily mortgaged, it was determined to cease operations and liquidate the business. On June 24, 1932, Ewing, trustee, brought suit for foreclosure of the mortgage, and on July 5, 1932, a receiver was appointed by the state court at the instance of the bondholders. The pending suit was brought and process was served on Austin on October 8, 1932. The following facts indicate the activities of Certain-teed in Virginia and Austin's status at that time: After it was decided in April to discontinue the operation of the plant, Certain-teed entered into a contract with the United States Gypsum Company to buy from it all the goods needed by Certain-teed for sale to its customers in the southeastern section of the United States, the goods to be shipped from the Gypsum Company's plant at Plasterco, Va., a point five or six miles from North Holston. In accordance with the contract, the goods were manufactured under formulas furnished by Certain-teed and bore its name and brands. Its name appeared as consignor on the shipments, the bills of lading and shipping orders being printed on forms bearing its name as shipper. These shipments were made in large numbers to dealers and builders in Virginia, North Carolina, Tennessee, Alabama, and other states. Salesmen of Certain-teed obtained orders in this territory, transmitted them to a sales office of Certain-teed in Philadelphia, from which, after approval, they were mailed to the Certain-teed Products Corporation at Plasterco.

Austin had no connection with the business conducted by the receiver of Beaver at North Holston, but after the receiver's appointment in July, 1932, he was in the employ of Certain-teed. He continued to reside at North Holston but spent the usual business hours at Plasterco at the plant of the United States Gypsum Company from which the shipments were made, and it is a reasonable inference in the absence of evidence to the contrary that he exercised some supervision over the goods manufactured according to Certain-teed's formulas and shipped to its customers. Mail addressed to Certain-teed at North Holston was delivered to him in accordance with a letter to post office authority written on paper bearing the inscription "Certain-teed Products Corporation—from Plasterco, Virginia office." Austin received all the mail of Certain-teed, wrote letters on its stationery, informed certain persons that he was working for it and spoke of engaging one or more of them to work for him at Plasterco. He was also keeping an eye on the operations of the receiver and his shipments, for Certain-teed regarded the old business as its competitor; and Austin was paid for his services by counsel for Certain-teed.

It is of great significance, in view of the persistent efforts of Certain-teed to have the suit dismissed on the grounds mentioned, that it failed to offer any evidence whatsoever as to the nature and extent of its activities at Plasterco, although of course the facts were especially within its knowledge. Under these circumstances, we cannot avoid the conclusion that the motions for the dismissal of the suit were without merit, and we have no difficulty in affirming the conclusions of the District Judge that there was substantial evidence to show that Certain-teed was doing business in the legal sense in the state of Virginia, and that Austin was a representative of the corporation of sufficient rank to justify the service of process upon him under the provisions of section 6064 of the Virginia Code. Cannon Mfg. Co. v. Cudahy Packing Co., 267 U.S. 333, 45 S.Ct. 250, 69 L.Ed. 634, is distinguishable.

A more detailed history of the relations between the corporations will assist in an understanding of the merits of the case. Beaver of Virginia owned gypsum mines and a plant for mining and for the manufacture and sale of gypsum products at North Holston, Va. Certain-teed obtained control of the corporation on April 1, 1928, when it purchased all of the assets of the Beaver Products Company of New York of which the Virginia corporation had been a subsidiary. Thereby Certain-teed acquired 3,500 shares of preferred stock and 6,670 shares of Class A voting common stock of Beaver of Virginia. There were left outstanding 3,300 shares of Class B voting common stock of the corporation, which remained the property of the holders of bonds to the amount of $350,000. The corporation was managed by a board of nine directors, of whom six were elected

by the holders of the A stock and three by the holders of the B stock. Except for this distinction, both classes of common stock had the same rights and privileges.

On April 23, 1928, an agreement was entered into between Certain-teed and Beaver; under which the former was to handle all the sales of Beaver products and attend to the administrative work of the corporation. The practical men in charge of the operation of the mine and the plant were retained. The offices of the two corporations were conducted at the same place in New York City, where all the permanent bookkeeping records of Beaver were kept and the affairs of both companies were conducted by the same persons. The president of Beaver was the vice president of Certain-teed; the secretary and treasurer, the assistant secretary and treasurer and the auditor of both companies were in each case the same persons, and the salesmen and administrative employees of Beaver were employees of Certain-teed. The latter handled all the sales of Beaver products, sold them as its own, and billed and collected therefor in its own name, crediting Beaver therefor on a running account between them. This close connection between the corporations and the complete administrative control exercised by Certain-teed enabled it to dominate the activities of Beaver and to engage in the transactions which form the basis of this suit.

Beaver of Virginia continuously lost money during the period from April, 1928, until June 24, 1932, when an application for receiver was filed in the state court, and the total losses were sufficient to wipe out Certain-teed's investment in the corporate stock. On April 19, 1932, the stockholders of Beaver authorized and directed the directors and officers of the corporation to cease operations and to dissolve and liquidate the company. This action was taken against the vote of the owners of Class B stock, who were also the owners of the bonds. Negotiations between the officers of the company and representatives of the bondholders followed, with a view to a voluntary transfer of the mortgaged property to the bondholders; but they desired the company to continue the operation of the plant, as required by the mortgage, and finally on June 24, 1932, filed a suit to foreclose the mortgage and caused an attachment against the property to be issued. On the same day the bill for receiver was filed and a receiver was appointed, as we have

seen, on July 5, 1932, the petition for bankruptcy was filed on November 5, 1932, and after the adjudication in bankruptcy on June 2, 1933, G. J. Wallinger, who had acted as receiver for the state court, was elected trustee in bankruptcy. The pending suit was brought on October 8, 1932, by the receiver and the trustee for the bondholders, and after the adjudication in bankruptcy, the trustee in bankruptcy was substituted for the receiver as party plaintiff.

As a result of the business losses of Beaver, its working capital became depleted in 1929 and it was in need of cash, and thereupon Certain-teed loaned to Beaver $45,000 on demand notes and thereafter from time to time until 1932 continued to make loans to Beaver on demand notes, and the balance due on these notes in June and July, 1932 was $30,000. After it was determined to liquidate the company in April, 1932, Certain-teed discontinued the practice of advancing the necessary money directly to Beaver, and from and after May 1, 1932, paid the bills of Beaver direct as well as the wages of its employees and other necessary operating expenses. At this time an acknowledgment of the indebtedness was made in a letter from Beaver to Certain-teed and it was stated that inasmuch as Certain-teed would continue to make advances for Beaver, that Certain-teed might apply any amounts which it might owe for Beaver products first to the liquidation of the notes and then against other charges on the current account. The only difference between the practice after May 1, 1932, seems to have been the discontinuance of further direct loans to Beaver, and in place thereof, the bills and expenses of Beaver were paid by Certain-teed.

The evidence admits of no doubt that at least as early as April 19, 1932, when it was decided to liquidate, Beaver was insolvent. The contention is made that it was not in fact insolvent, at least prior to June 24, 1932, when the foreclosure suit was instituted. The basis of the argument is an audit of the Beaver books by certified public accountants for the year ending December 31, 1931 which showed assets of $615,458.93 and liabilities, exclusive of capital stock, of $326,112.94. But the substantial evidence as to the real condition of affairs in April, 1932, was so overwhelming as to justify a directed verdict on the point. At a special meeting of the board of directors of Beaver held in the office of the

company in New York City on April 5, 1932, the president of the company submitted a statement showing a loss of $290,-753.30 for the past five years' operation, due to competition, the financial depression and other causes, and pointed out that a recent survey by the company's engineers disclosed a serious shortage of the mining deposits. The president stated that it was the opinion of the management that the situation was hopeless and that the company should cease operations at once and stop further losses; that such action would constitute a breach of the mortgage and that the bondholders could and no doubt would foreclose and take over the property, but that there seemed to be nothing else to do. Like statements were made at the stockholders' meeting of April 19, 1932, concluding with the recommendation to the stockholders, which was approved, that the operation of the plant be immediately discontinued, the interest on the mortgage due July 1, 1932, be not paid, and the company be liquidated as promptly as possible. It was after this meeting and whilst the conditions described still prevailed, resulting thereafter, as we have seen, in foreclosure, receivership, and bankruptcy proceedings, that a number of the payments and transfers from Beaver to Certain-teed now to be described were made.

Coming to the merits of the appeal in No. 4088, we consider first a group of items of the plaintiff's claim as to which the court directed a verdict in their favor. These items relate to moneys and property of Beaver which were turned over to Certain-teed and appropriated to its own use after the business of Beaver had proved so unsuccessful that liquidation had been decided upon:

(1) Certain policies of insurance of Beaver were canceled and Certain-teed, having collected the unearned premiums or gotten credit therefor, appropriated them to its own use and credited the amounts on an open account between the corporations. Most of these transactions took place after the appointment of the receiver. The total sum was $2,250.21, made up of $282.74 on workmen's compensation insurance, $102.44 on steam boiler insurance (the first of which items was collected before and the second after the appointment of the receiver on July 5, 1932), $45.31 on automobile insurance, and $1,800.08 on compensation insurance collected in November, 1932; and $19.-64 on a fidelity bond collected in December, 1932. It is conceded that Certain-teed got the benefit of all of these sums either in cash or through credits given to it by the insurance companies on its accounts with them, the premiums having originally been paid by Certain-teed. It is also established that credit for these items was given by Certain-teed to Beaver on a running account between them. It is relevant that on June 30, 1932, an assignment was made by Beaver to Certain-teed of any return premiums due to Beaver from the insurance company on account of workmen's compensation insurance. This assignment was executed by officers of Beaver who were also officers of Certain-teed.

(2) Certain-teed secured bank balances of Beaver totaling the sum of $2,520.78 as follows: $700 by check of Beaver to Certain-teed in June, 1932, on the Saltville Bank; $1,035.35 by check of Beaver to Certain-teed on June 15, 1932, on the Chase National Bank, and $785.43 by check from Beaver to Certain-teed on June 28, 1932, on the Chase National Bank. Beaver was given credit for these amounts on its current account with Certain-teed.

(3) Certain-teed obtained certain tangible property of Beaver on June 24, 1932, of the total value of $1,931.55, consisting of shipping supplies, packing and manufacturing stock in the amount of $1,331.55 and a carload of cement valued at $600. The property was taken from the Beaver plant at North Holston partly by truck and partly by railroad car on June 24, 1932, the day that the attachment was issued against the property of Beaver at the suit of the bondholders, and delivered to the plant of the United States Gypsum Company at Plasterco. That which was transported by truck left the Beaver plant before the attachment was levied late in the afternoon, but the merchandise in the car remained on the premises until the following day. The evidence is conclusive that these articles were the property of Beaver, and credit was given to Beaver for them on the books of Certain-teed.

With respect to these items, Certain-teed asserts that it has no liability, contending that Beaver was indebted to it in a large sum, and that the payments and transfers were made by or with the consent of the officers of Beaver which received full credit therefor on its debt. The evidence does not show with certainty that Beaver was in-

debted to Certain-teed after June 23, 1932. On that date Certain-teed assigned to its general counsel the Beaver demand notes, totaling $30,000 "without recourse and for value," and exclusive of this item, the balance of the account between the corporations was in favor of Beaver. On July 2, 1932, judgment was confessed on the notes in favor of the attorney. No attempt was made by Certain-teed to show that notwithstanding the assignment to its attorney, the indebtedness was really due to it; and the court record was allowed to stand. It seems to follow that even upon its own theory of the case, Certain-teed had no lawful right to accept Beaver's property after June 23, 1932, and that whatever assets it got after that date it is obligated to account for to the representatives of the creditors. But even if we assume that the assignment of the notes was formal only, and that the attorney was holding them for the benefit of Certain-teed, its acceptance of the transfers after the insolvency of Beaver was apparent cannot be justified.

Certain-teed invokes the rule that the mere fact that the voting stock of one corporation is owned by another, and that the two have the same officers and directors, does not make the holding company liable for the debts or engagements of the other or create the relationship of principal and agent between them. On the other hand, the receiver cites authorities for the familiar statement that when such stock ownership and control are resorted to not for the purpose of participating in the affairs of the subsidiary corporation in a manner normal and usual with stockholders, but for the purpose of making it a mere agent or instrumentality or department of the holding company, the courts will look through the form of the situation and deal with it as the justice of the case may require. Chicago, M. & St. P. R. Co. v. Minneapolis C. & C. Ass'n, 247 U.S. 490, 38 S.Ct. 553, 62 L.Ed. 1229; United States v. Reading Co., 253 U.S. 26, 40 S.Ct. 425, 64 L.Ed. 760; Pullman's Palace Car Co. v. Missouri Pacific R. Co., 115 U.S. 587, 6 S.Ct. 194, 29 L.Ed. 499; Richmond & I. Const. Co. v. Richmond, N., I. & B. R. Co. (C.C.A.) 68 F. 105, 34 L.R.A. 625; Cleveland Trust Co. v. Consolidated Gas, Electric Light & Power Co. (C.C.A.) 55 F.(2d) 211, 215; Cannon Mfg. Co. v. Cudahy Packing Co., 267 U.S. 333, 45 S.Ct. 250, 69 L.Ed. 634; Interstate Tel. Co. v. Baltimore & O. Tel.

Co. (C.C.) 51 F. 49; Baltimore & O. Tel. Co. v. Interstate Tel. Co. (C.CA.) 54 F. 50; Joseph R. Foard Co. v. State of Maryland (C.C.A.) 219 F. 827; The Willem Van Driel, Sr. (C.C.A.) 252 F. 35; Luckenbach S. S. Co. v. W. R. Grace & Co. (C.C.A.) 267 F. 676; Davis v. Virginia Ry. & Power Co. (C.C.A.) 229 F. 633; Hamilton Ridge Lumber Sales Corp. v. Wilson (C.C.A.) 25 F.(2d) 592; Martin v. Development Co. of America (C.C.A.) 240 F. 42.

The difficulty attending the application of these broad statements to particular facts has confronted the courts in numerous cases and has been the subject of extended discussion of text-writers as well. It is obvious that the extent of stock ownership and potential control possessed by the holding company is not the determining factor when its liability for the acts and obligations of the subsidiary are under consideration. Something more must be found—something of fraud, or illegality, or wrongdoing, productive of loss or injury to the complainant, to justify the courts, as they are wont to say, in disregarding the corporate entity of the subsidiary body; and it is because of the vague boundaries of this added essential element that it is well nigh impossible in the present state of the law to enunciate a clear cut rule. Powell on Parent and Subsidiary Corporations, c. 1; Latty on Subsidiaries and Affiliated Corporations, pp. 5, 41, 142, 143, and cases cited.

In the pending case, it is not necessary to meet this difficulty squarely because even if it be assumed that the corporations should be strictly considered as separate persons in law to the extent that the one is not responsible for the liability of the other, nevertheless it must be held that Certain-teed is responsible to the receiver for the moneys and properties which it received from Beaver because its acceptance thereof constituted a participation on its part in the commission of a wrong for which it cannot avoid responsibility. It is obvious that after the appointment of the receiver, Certain-teed had no right under any theory to accept money or property in payment of the indebtedness of Beaver, because all the assets of Beaver had passed to the receiver for all the creditors. Nor had Certain-teed any right to accept such payment after the stockholders of Beaver had directed the cessation of business operations and the liquidation of corporate affairs at the meet-

ing of April 19, 1932. A conflict arose at that meeting between Certain-teed, the owner of two-thirds of the voting stock, and the bondholders, who owned the remaining one-third and were opposed to the abandonment of the business. They were outvoted by the majority owner and the formal resolution of dissolution was passed. Manifestly the purpose of the resolution was that there should be a reduction of the corporate assets to cash and an orderly distribution amongst the creditors; and this design was frustrated when Certain-teed, in disregard of the claim of other creditors, accepted preferential payments. The effect of its action of course was to hinder the creditors of Beaver, including the bondholders, whose security, as it turned out, proved insufficient to meet the mortgage debt by something over $190,000. It would not be difficult, in view of the complete control of the business by the officers and employees of Certain-teed, to reach the conclusion that these payments were made upon its direct order, and it is certain that they were received with complete knowledge on its part that they were contrary to the purpose of the resolution of the stockholders passed at its own instance. Participation in a wrongful diversion of assets therefore occurred and a liability arose which the receiver may enforce in this suit. It is no answer to say that in Virginia, a preferential transfer by an insolvent corporation to a stockholder has been held permissible in such cases as Alexandria Savings Inst. v. Thomas, 70 Va.(29 Grat.) 483; Planters' Bank v. Whittle, 78 Va. 737; Reid v. Perrow, 136 Va. 449, 118 S.E. 120; Beck v. Semones' Adm'r, 145 Va. 429, 134 S.E. 677, for these cases do not go so far as to authorize a preference which has been obtained by a creditor in complete control of the affairs of a corporate debtor. The rule generally prevailing under such circumstances is to the contrary. Richardson v. Green, 133 U.S. 30, 10 S.Ct. 280, 33 L.Ed. 516; Sutton Mfg. Co. v. Hutchinson (C.C. A. 63 F. 496; see, also, Jackman v. Newbold (C.C.A.) 28 F.(2d) 107, 62 A.L.R. 729; Wiggington v. Auburn Wagon Co. (C.C.A.) 33 F.(2d) 496, 500.

The liability of Certain-teed for certain other wrongful transactions in which, to say the least, it participated with Beaver, is equally clear. All of these transactions related to property covered by the bond mortgage in which Beaver, the mortgagor, disposed of property covered by the mortgage in violation of the terms of the instrument and thereby reduced the security of the mortgagee. During the latter part of April, 1932, one of the buildings at North Holston was destroyed by fire and not replaced. Insurance in the amount of $800 was collected and deposited in the bank account of Beaver and disbursed as current funds. This action was contrary to the covenant of the mortgagor that all moneys received under the policies of insurance, which it was obliged to maintain upon the buildings for the benefit of the trustee under the mortgage, should be held by the trustee as part of the mortgaged property and paid out either for the purpose of replacing the property destroyed or for the redemption of the bonds. There were also items of machinery and equipment of Beaver covered by the mortgage which were sold to third parties or transferred to Certain-teed prior to the period of insolvency. They consisted of a locomotive crane, which was sold on July 5, 1930 for $3,500, and other miscellaneous items sold or transferred in the years 1930, 1931, and the early part of 1932 in the aggregate sum of $1,334.28. Some of these items were sold to third parties and some were transferred to Certain-teed. If sold to outsiders, the proceeds were deposited in the bank account of Beaver, and if sold to Certain-teed, credit was given on the running account between the corporations. Under the mortgage, the mortgagor was permitted to sell or exchange such movable property as had become worn out, disused, unfit, or unnecessary, provided that before doing so the mortgagor should renew the same or substitute other property equally effective, suitable, and valuable, so as to maintain the efficiency of the plant unimpaired. During the period covered by the transactions last referred to, certain additions to the mine equipment were made, and the question was submitted to the jury whether the efficiency of the plant was thereby maintained as contemplated by the mortgage notwithstanding the sales and transfers under consideration. The judge permitted the jury to consider such additions of the aggregate value of $5,873.21 as could be reasonably supposed to have constituted replacements of the articles sold and transferred. He excluded from the consideration of the jury other additions which could not fairly be considered substitutions for those which had been

sold and transferred. We find no error in his rulings in this respect. The result was that it was left to the jury to determine whether the additions submitted to their consideration constituted substantial compliance with the terms of the mortgage. The jury found for the plaintiff for the sum of $4,834.28 thereby indicating that none of the additions constituted replacements of the removed articles. With regard to the item of insurance money in the sum of $800, the judge directed a verdict in favor of the plaintiff.

It is urged that it was error to find against the Certain-teed in these transactions because in so far as they involved cash sums, the money did not come into the possession of Certain-teed, but was deposited in the bank account of Beaver and used by it; and that as to articles transferred to Certain-teed, credit was given on a running account between the corporations. Certain-teed nevertheless cannot avoid responsibility for any of these transactions because, through its own officials who were at the same time officers or employees of Beaver, it had knowledge of the breach of the covenant in the mortgage involved in withholding the money from the bondholders and failing to make substitutions for the movable property sold or exchanged; and instead of preventing the breach as it could easily have done through its domination of its subsidiary, it knowingly participated in the wrongdoing and profited thereby as the owner of all the preferred and two-thirds of the common stock of the subsidiary body.

■■■ In Davis v. Virginia Ry. & Power Co. (C.C.A.) 229 F. 633, liability of a majority stockholder for an improper diversion of the mortgaged property was adjudged on the ground that it occupied a fiduciary relation. Moreover, it is settled law that one who without justifiable cause induces a person to break a contract with another is liable to the latter for the damages caused by the breach. Cooley on Torts, § 227; Elliott on Contracts, § 2685, et seq.; and one who participates in the commission of a tort by another is a joint tort-feasor. So it has been held that the director of a corporation who orders that infringing machines be manufactured and sold by the corporation is personally liable for the tort. National Cash-Register Co. v. Leland (C. C.A.) 94 F. 502; Claude Neon Electrical Products v. Brilliant Tube Sign Co. (C. C.A.) 48 F.(2d) 176. Likewise it was held in Detroit Motor Appliance Co. v. General Motors Corp. (D.C.) 5 F.Supp. 27 that a holding company was liable for the infringement of a patent by its subsidiary, the directors and officers of the latter being officials of the former. See, also, Westinghouse Electric & Mfg. Co. v. Allis-Chalmers Co. (C.C.A.) 176 F. 362. This is a reasonable application of the same principle. The argument is well put in Latty on Subsidiaries and Affiliated Corporations, p. 85, as follows: "If it were a case of a sole stockholder actively managing his corporation through his official position as director, president, and general manager, there would be no difficulty in saying that he 'operates and controls' the corporation; in such a case there is no difficulty in fastening the 'management' on the stockholder. And if an individual stockholder can manage and operate, why cannot the corporation stockholder do so? To urge that the corporate stockholder cannot manage and control because, ultimately, the managing is done by individuals, is to step back into the era when it was similarly urged that a corporation could not be held responsible for crimes and torts. A corporation can only act through its agents; if it manages a project it does so through its agents. If individuals who in one capacity are its agents are found managing an enterprise owned by it, one should have little trouble in inferring that the corporation is managing the enterprise. In other words, * * * where the directors and officers of the subsidiary are subordinate employees, the parent corporation is at once the de facto board of directors and the managing officer of the subsidiary. So the liability which is placed upon it for the subsidiary's infringement can be co-extensive, (at least) with that placed upon directors and managing officers for the infringements by corporations which they direct and manage."

These general principles are of course applicable to all torts. See Joseph R. Foard Co. v. State of Maryland (C.C.A.) 219 F. 827; The Willem Van Driel, Sr. (C.C.A.) 252 F. 35; Luckenbach S. S. Co. v. W. R. Grace & Co. (C.C.A.) 267 F. 676; Gulf, C. & S. F. Ry. Co. v. Cities Service Co. (D.C.) 281 F. 214.

■■■ In the District Court, a question of pleading arose which we have reserved for consideration until this time when its bearing may be more easily understood. A plea of misjoinder of parties plaintiff was filed on the ground that the cause of action of the receiver, later replaced as party

plaintiff by the trustee in bankruptcy, was totally different from that of the trustee under the mortgage. The plea was overruled. It is true that the trustee under the mortgage had no interest in the items of property above discussed which were not covered by the mortgage; but the trustee in bankruptcy was competent to sue upon all items mentioned in the complaint, since all related to the bankrupt's property and the court of bankruptcy had the duty and power to direct the disposition of any sums that might be recovered to the general or to the secured creditors according to their respective interests. As a matter of fact, the mortgaged property as well as the general assets were both sold by the trustee in bankruptcy. He held the proceeds subject to the rights of both sets of creditors; and there would have been no impropriety in a suit by him alone proceeding for his own use and benefit as trustee and also for the benefit of the trustee under the mortgage. A similar method was pursued in Pacific Mut. Life Ins. Co. v. Davin (C.C.A.) 5 F. (2d) 481. Both trustees were represented by the same counsel in the pending case, and it was evidently the theory of the plaintiffs that the trustee in bankruptcy as such should press the suit against Certain-teed for the wrongful diversion of both classes of property. This is shown by the failure of counsel for the plaintiffs to join the trustee under the mortgage in the appeal in No. 4089. We think it was unwise to bring the appeal in this fashion, but we do not find it necessary to decide whether the omission was fatal to the appeal, since we dismiss the appeal for other reasons above stated. So far as No. 4088 is concerned, the technical defense of misjoinder, if one exists, may be cured by amendment of the declaration eliminating the trustee under the mortgage as party plaintiff and declaring that as to the property covered by the mortgage, the trustee in bankruptcy sues for the benefit of the trustee under the mortgage. Such an amendment is permissible in the appellate court. See Jeffreys v. O'Neal (C.C.A.) 64 F.(2d) 284, 286. See, also, Johns v. Wilson, 180 U.S. 440, 451, 21 S.Ct. 445, 45 L.Ed. 613.

The appeal in No. 4089 will be dismissed; the judgment in No. 4088 will be affirmed, and the mandate of the court will be stayed until the amendment of the declaration is filed herein.

No. 4089 dismissed.

No. 4088 affirmed.